(182 P.3d 1280)
No. 96,929

STATE OF KANSAS, *Appellee*, v. RACHELLE BALE, *Appellant*.

Opinion filed May 16, 2008.

*Michelle Davis*, of Kansas Appellate Defender Office, for appellant.

*Thomas R. Stanton*, deputy district attorney, *Karen S. Smart*, assistant district attorney, *Keith E. Schroeder*, district attorney, and *Paul J. Morrison*, attorney general, for appellee.

Before BUSER, P.J., MALONE and MCANANY, JJ.

MCANANY, J.: The tragic circumstances which led to Rachelle Bale's conviction of involuntary manslaughter began on February 26, 2005. The late winter day was sunny and warm, with temperatures in the 50's. Bale and her husband, Kenneth, accompanied by their daughters, ages 1 and 2, and Bale's son, Shawn Casey (Casey), visited a local campground to check on the condition of their trailer following a recent ice storm. Casey, age 11, suffered from hydrocephalus. He had limited use of his right arm and leg and could not walk without the assistance of a walker. As a result, when not in a wheelchair he usually crawled to get from place to place and could do so rather quickly.

Casey was playing with his toy cars on the ground in front of the trailer. Richard Fabrizeus, Bale's brother-in-law, arrived at the campsite just as Bale placed her daughters in the family car in order to take them for a ride. As Fabrizeus observed Bale backing up in her vehicle, he heard a couple of thumps and saw Casey under the vehicle. Bale jumped out of the car and became hysterical when she realized what happened. Kenneth, who was inside the trailer, heard the commotion, came out, and saw Casey lying on the ground. A 911 call was placed for help.

Bale was hysterical and had to be restrained by her husband while emergency personnel attempted to perform CPR on Casey. She screamed that "she had killed her baby and she didn't see him, and she was so sorry." A later autopsy revealed that Casey died from a blunt force head injury and hemorrhaging of the brain. Deputy Sheriff Corey Graber, who arrived at the scene in response to the 911 call, smelled an odor of alcohol emanating from Bale. So did Deputy Paul Mendoza who also responded.

Bale had a history of stress-induced seizures. While the paramedics attempted to resuscitate Casey, Bale experienced a seizure and was taken to the hospital. After Bale was stabilized in the hospital emergency department, Deputy Mendoza read to her the re-

quired implied consent advisory notices as a prerequisite to obtaining a blood sample. During the course of Mendoza's reading, Bale interrupted and stated that "yes, she was intoxicated and yes, she's responsible for the accident and that she did not mean to hurt her son." Bale repeatedly told the officers she was guilty, that she had been intoxicated, and that she had killed her baby. Bale agreed to submit to a blood alcohol test, which later disclosed an alcohol concentration of 0.14 grams per 100 milliliters of blood in excess of the legal limit permitted for drivers in Kansas. See K.S.A. 2007 Supp. 8-1001; K.S.A. 2007 Supp. 8-1567.

About a week later, on March 4, 2005, before the result of Bale's blood alcohol test was obtained, Detective Diana Skomal interviewed Bale at the Reno County Law Enforcement Center. Detective Skomal advised Bale at the outset that she was there at her own free will and was not being placed under arrest. Detective Skomal did not read Bale her *Miranda* rights. Bale told Skomal that she had intended to take her daughters for a ride around the campsite. Because Casey also enjoyed riding in the car, she guessed that he tried to get into the back seat of the car when she was backing up. She did not see Casey and struck him with the vehicle. Bale stated she had consumed three or four beers within an hour prior to getting in the vehicle.

The State charged Bale with involuntary manslaughter while driving under the influence of alcohol. See K.S.A. 21-3442. Bale moved to suppress her incriminating statements to Deputies Graber and Mendoza and to Detective Skomal, claiming that she should have been informed of her *Miranda* rights before being interviewed. The district court denied the motion, finding that Bale's statements were voluntary and not the product of any custodial interrogation. Bale was found guilty at her jury trial, and the court denied her posttrial motion for a new trial or for judgment of acquittal. At sentencing the court denied Bale's departure motion and imposed a mitigated sentence of 38 months' imprisonment, followed by 36 months of postrelease supervision. The journal entry memorializing the court's rulings at the sentencing hearing also ordered Bale to reimburse the Board of Indigents'

Defense Services (BIDS) $2,500 for her attorney fees and the $100 application fee. Bale appeals.

*Jury Instructions—Causation*

Bale argues the district court erred in failing to instruct the jury that in order to find her guilty of involuntary manslaughter, the State must establish that her conduct was the proximate cause of Casey's death and that Casey's conduct was not an intervening cause.

Since Bale did not object at trial to the court's failure to provide this instruction, we apply the clearly erroneous standard, pursuant to which we will find reversible error only if the trial court erred in instructing the jury and there is a real possibility that the jury would have returned a different verdict but for the error. See K.S.A. 22-3414(3); *State v. Cooperwood*, 282 Kan. 572, 581, 147 P.3d 125 (2006).

The district court instructed the jury that in order to convict Bale of involuntary manslaughter while driving under the influence of alcohol it had to find:

"1. That [Bale] unintentionally killed Shawn Casey;
"2. That it was done in the commission of the act of operating any vehicle in this state while having an alcohol concentration in her blood of .08 or more as measured within two hours of the time of operating or attempting to operate the vehicle, or that it was done in the commission of the act of operating any vehicle in this state while having an alcohol concentration in her blood of .08 or more as shown by any competent evidence."

The court also instructed the jury as follows regarding Casey's conduct:

"Contributory negligence of Shawn Casey is no defense. It is a circumstance to be considered along with all other evidence to determine whether [Bale's] conduct was or was not the direct cause of Shawn Casey's death. Shawn Casey's negligence may have been such a substantial factor in his death as to be itself the cause."

*— Proximate Cause*

Bale contends that the court also should have instructed the jury to determine "whether Shawn's death occurred as a proximate result of Ms. Bale's operation of a vehicle while under the influence of alcohol, or whether there was an intervening cause, Shawn's act

of crawling behind the car." This contention addresses issues of both proximate cause and intervening cause. We will take up those notions in order.

Bale's proposed instruction asserted for the first time in this appeal is similar to that given by the district court in *State v. Collins*, 36 Kan. App. 2d 367, 368, 138 P.3d 793 (2006) (" 'proximate cause or legal cause . . . is that cause which in natural continuous sequence, unbroken by an intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence or result of the defendant's act' "). The district court must instruct the jury in a criminal case " 'on the law applicable to the defendant's theories for which there is supporting evidence.' " *State v. Hayden*, 281 Kan. 112, 131, 130 P.3d 24 (2006).

To convict a defendant of involuntary manslaughter the defendant's actions must be the proximate cause of the victim's death. See *State v. Anderson*, 270 Kan. 68, 72, 12 P.3d 883 (2000); *State v. Yowell*, 184 Kan. 352, 336 P.2d 841 (1959); *State v. Woodman*, 12 Kan. App. 2d 110, 113-17, 735 P.2d 1102 (1987). This concept is adequately expressed in an instruction which provides that "the State is required to prove that the defendant unintentionally killed the victim." *State v. Chastain*, 265 Kan. 16, 25, 960 P.2d 756 (1998); see PIK Crim. 3d 56.06-A. Bale's jury was instructed that one of the elements of the crime was "[t]hat [Bale] unintentionally killed Shawn Casey." As stated in *State v. Scott*, 285 Kan. 366, 371, 171 P.3d 639 (2007):

" 'Killing' connotes specific, proximate causation—not merely a peaceful, natural death. We note that Black's Law Dictionary recognizes the word's necessary implication; 'kill' means 'to end life; to *cause* physical death.' (Emphasis added.) Black's Law Dictionary 886 (8th ed. 2004)."

The requirement of proximate cause was adequately expressed in the court's instruction for the elements of the crime. The district court did not err in failing to give a separate proximate cause instruction.

*— Intervening Cause*

Bale's claim that Casey's conduct constituted an intervening cause which should have been explained in the jury instructions requires us to consider, as a preliminary matter, the court's instruction on Casey's possible contributory negligence. Here, the court instructed the jury that it may consider Casey's fault along with other evidence to determine whether Bale's conduct was the cause of Casey's death.

Contributory negligence is not a defense to involuntary manslaughter. Nevertheless, a victim's own conduct may be so substantial a factor so as to be the direct cause of death. See *State v. Gordon*, 219 Kan. 643, 653, 549 P.2d 886 (1976). The court's instruction here is consistent with *Gordon* and mirrors the instruction suggested by the court in *Collins*, 36 Kan. App. 2d at 372 (" 'The fault or lack of fault of [victim] is a circumstance to be considered along with all the other evidence to determine whether the defendant's conduct was or was not the direct cause of [victim's] death.' "). However, our examination of the trial transcript discloses no testimony whatsoever, direct or inferential, that Casey was at all negligent in the events which led to his death. While Bale speculated about what her son may have been doing immediately before the accident, we have no evidence whatsoever about what Casey was doing or how he may have contributed to causing his death. From the evidence at trial, we learn only that Casey was playing on the ground outside the trailer with his toy cars, that Fabrizeus heard thumps as Bale backed up her vehicle, and that he then saw Casey who had been run over by the vehicle. There was no basis in fact for this instruction. However, neither in opening statements nor in closing arguments did either party refer to any conduct whatsoever by Casey or suggest that Casey was negligent in bringing about his own death. Given the jury's verdict, it is apparent that the error in instructing on contributory negligence was harmless.

Since there was a total lack of evidence of conduct by Casey, negligent or otherwise, which could have brought about his own death, the notion of intervening cause simply does not come into play. PIK Civ. 3d 104.03 is instructive.

"If an injury arises from two distinct causes which are independent and unrelated, then the causes are not concurrent. Consideration then must be given to the question of whether the causal connection between the conduct of the party responsible for the first cause and the injury was broken by the intervention of a new, independent cause which acting alone would have been sufficient to have caused the injury. If so, the person responsible for the first cause would not be at fault. If, however, the intervening cause was foreseen or should reasonably have been foreseen by the person responsible for the first cause, then such person's conduct would be the cause of the injury, notwithstanding the intervening cause, and (he) (she) would be at fault."

Bale does not contest that her act of driving the vehicle while intoxicated was the original cause. She argues, however, that Casey's actions broke the sequence of events between this first cause and Casey's ultimate death. She fails to identify those actions by Casey, and we find none in the record. There was no "new, independent cause which acting alone would have been sufficient to have caused the injury."

The facts now before us are not at all comparable to those in *Collins*, where an adult motorcycle passenger sat on a motorcycle parked in the middle of the road just beyond a curve in the road in the middle of the night. There was expert testimony that the defendant's intoxication was not a contributing factor in the death of the motorcycle passenger since, under the circumstances, even a sober driver would not have been able to avoid the accident. Under such circumstances, this court found it appropriate to instruct the jury on the issue of intervening cause. 36 Kan. App. 2d at 368-72.

No such evidence was presented at Bale's trial to warrant an instruction on intervening cause. The district court did not err in failing to instruct the jury on intervening cause. Thus, we do not reach the second element of the clearly erroneous analysis.

*Suppression of Evidence*

Bale does not challenge on appeal the court's refusal to suppress her statements to Deputies Graber and Mendoza. She contends, however, that her confession to Detective Skomal was the product of a custodial interrogation and should have been suppressed because she was not advised in advance of her *Miranda* rights. She

argues that considering the fact of her emotional instability at the time and the fact that she was the only suspect, no reasonable person under the circumstances would have felt free to leave.

Without reweighing the evidence, we review the district court's findings to determine whether they are supported by substantial competent evidence. We consider de novo the ultimate legal issue of whether Bale's statement to Detective Skomal should be suppressed. See *State v. Rupnick*, 280 Kan. 720, 727, 125 P.3d 541 (2005).

Before any custodial interrogation, a defendant must be warned of his or her constitutional rights. *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 649, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966). A "custodial interrogation" is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way. In contrast, an "investigatory interrogation" is the questioning of a person by a law enforcement officer in a routine manner in an investigation that has not reached the accusatory stage and when such person is not in legal custody or deprived of his or her freedom in any significant way. *State v. Jacques*, 270 Kan. 173, 186, 14 P.3d 409 (2000). Here, the police investigation had not reached the accusatory stage since the result of Bale's blood alcohol test was not known until well after Detective Skomal's interview.

Though Bale was not under arrest at the time, we must determine whether Bale's freedom of movement was restrained to the degree found in the case of a formal arrest. See *State v. Fritschen*, 247 Kan. 592, 599, 802 P.2d 558 (1990). The fact that Bale was the focus of the investigation is not decisive. Nor is the fact that the interrogation took place in a police station dispositive of the issue. See 247 Kan. at 603-04. We must consider how a reasonable person in Bale's position would have understood the situation. See *Rupnick*, 280 Kan. at 740.

In *Fritschen*, 247 Kan. at 603, our Supreme Court provided a nonexclusive list of the following factors which may be significant in a case-by-case analysis to determine whether the defendant's interrogation was custodial: (1) when and where interrogation occurred; (2) how long interrogation lasted; (3) how many police of-

ficers were present; (4) what the officers and the defendant said and did; (5) the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door; (6) whether the defendant was being questioned as a suspect or a witness; (7) how the defendant got to the place of questioning (*i.e.*, whether the defendant came completely on his or her own, in response to a police request, or escorted by police officers); and (8) what happened after the interrogation (*i.e.*, whether the defendant left freely or was detained or arrested).

In *Fritschen*, the court found that an interrogation at the police station was not custodial because the accused voluntarily went to the station for an interview, was subject to low-key interviewing tactics, and was free to leave at any time. 247 Kan. at 604-05. Here, Detective Skomal did no questioning in the hospital emergency department due to Bale's hysterical state. Instead, she gave Bale a business card and told her to call to set up an interview at a later date. Detective Skomal was not quite sure what happened on February 26, 2005, and, as far as she was concerned, Casey's death was simply an accident. Thereafter, Bale contacted Skomal and set up the interview. Bale drove herself to the police station to meet with Skomal. When she arrived, Bale was taken to an interview room and told that she was not under arrest. Detective Skomal was alone with Bale throughout the interview. Though Bale was told that she was free to leave at any time, she never indicated a desire to do so. The interview was not very long, and Detective Skomal permitted Bale to leave at its conclusion. Under these circumstances, a reasonable person in Bale's position would not perceive that she was in custody. Thus, the district court did not err in overruling Bale's suppression motion.

### BIDS Attorney Fees and Application Fee

The journal entry memorializing the district court's rulings at Bale's sentencing hearing ordered Bale to reimburse BIDS for her attorney fees and for the application fee. Bale claims that the district court did not order her to pay these BIDS fees at the sentencing hearing; that the court's oral pronouncements from the

bench at sentencing control over the later journal entry; and, therefore, that the district court should be directed to issue an order nunc pro tunc conforming the journal entry to the court's oral pronouncements at sentencing.

Sentencing is effective when pronounced from the bench, not when the court enters a subsequent journal entry. *Love v. State*, 280 Kan. 553, 560, 124 P.3d 32 (2005). " 'A journal entry which imposes a sentence at variance with that pronounced from the bench is erroneous and must be corrected to reflect the actual sentence imposed.' [Citation omitted.]" *State v. Branning*, 271 Kan. 877, 887, 26 P.3d 673 (2001). However, the imposition of BIDS attorney fees was not part of Bale's punishment for her crime. See *State v. Robinson*, 281 Kan. 538, 543, 132 P.3d 934 (2006). K.S.A. 22-4513 is simply a recoupment statute. 281 Kan. at 547. Thus, the rule cited earlier from *Love* does not apply. Nevertheless, before assessing BIDS attorney fees against Bale the sentencing court was required to consider on the record her financial resources and the nature of the burden that payment will impose. See *Robinson*, 281 Kan. 538, Syl. ¶ 1. Because this was not done here, we must set aside the order for attorney fees and remand the case with directions for the district court to comply with K.S.A. 22-4513 and *Robinson*.

With respect to the order for Bale to pay the BIDS application fee, our Supreme Court's recent decision in *State v. Hawkins*, 285 Kan. 824, Syl. ¶¶ 5, 6, 7, 176 P.3d 174 (2008), controls the K.S.A. 22-4529 issue at the time of sentencing. See *State v. Wenzel*, 39 Kan. App. 2d 194, Syl. ¶ 3, 177 P.3d 994 (2008). The district court did not err in the manner of its assessment of this application fee.

Conviction and imposition of BIDS application fee affirmed, order for BIDS attorney fees is vacated, and case remanded for further proceedings consistent with K.S.A. 22-4513 and *Robinson*.