NOT DESIGNATED FOR PUBLICATION

No. 115,509

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MICHAEL WAYNE EIKENBERRY,
*Appellant*.


MEMORANDUM OPINION

Appeal from Seward District Court; BRADLEY E. AMBROSIER, judge. Opinion filed August 25, 2017. Conviction affirmed, sentence vacated, and case remanded with directions.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Lynn Koehn*, special prosecutor, of Liberal, and *Derek Schimdt*, attorney general, for appellee.


Before SCHROEDER, P.J., POWELL and GARDNER, JJ.


*Per Curiam*:  In this direct appeal, Michael Wayne Eikenberry contends that the evidence was insufficient to support his guilty verdict for involuntary manslaughter. We disagree. He also contends, and the State agrees, that his sentence was illegal because it was based on a miscalculated criminal history score. That concession makes it unnecessary for us to decide other sentencing issues that Eikenberry raises. Accordingly, we affirm Eikenberry's conviction but vacate his sentence and remand for resentencing.

1

*Factual and procedural background*

On August 16, 2013, Iris Huskey went to Eikenberry's residence with Ray Jenkins. Thomas Miller was there when they arrived. Miller had resided with Eikenberry "off and on" for years. The group of four spent approximately 30 minutes drinking beer and socializing in Eikenberry's kitchen. At the time, Huskey did not notice any injuries to Miller's head. Miller, Jenkins, and Huskey then left and went to Huskey's home.

After arriving at her home, Huskey used the restroom while Jenkins and Miller smoked cigarettes outside. When Huskey came out of the restroom Jenkins was gone. Miller and Huskey talked for some time. Huskey did not observe that Miller had any physical injuries. In Huskey's opinion, Miller was extremely intoxicated. Eventually, Huskey told Miller to leave because he made repeated sexual advances towards her.

Miller left and went across the street to Chris Freeman's house and asked Freeman for a ride home. According to Freeman, Miller was intoxicated and drunk. Freeman did not notice any injuries on Miller. Freeman testified that he drove Miller to Eikenberry's house where he dropped Miller off and then left without seeing Eikenberry.

Eikenberry contradicted that testimony in part, saying that he confronted Miller as to whether he had spent all his money before Miller left Freeman's car. Eikenberry claims that an argument began after Miller entered his home when he asked Miller if he was bringing drugs into his home. Eikenberry testified that the argument escalated and Eikenberry slapped Miller with the back of his hand. According to Eikenberry, the argument defused and Miller continued drinking heavily. Eikenberry claims that Miller later fell and hit his head, either because he stumbled or because he passed out.

The next morning, Eikenberry called his mother, Debbie Eikenberry, and asked her to come check on Miller, who was passed out on his floor. Eikenberry said he called

2

her because he wanted her to see that Miller's alcohol use was a problem. Eikenberry's mother arrived at Eikenberry's house at approximately 6:30 a.m., saw Miller passed out on the floor, told Eikenberry that she "didn't need to be looking at a drunk," and left. Eikenberry then went to sleep until 11 a.m. and left for work around 1 p.m. When he returned home around 5 p.m. Miller was still unconscious. Eikenberry attempted to revive Miller but was unable to do so.

At approximately 8:15 p.m. Eikenberry called 911 because Miller remained unconscious. Deputy Jeff Keating saw Miller lying on the floor of the threshold between the kitchen and living area, bleeding from his ears. Eikenberry told Keating that he did not know how Miller was injured. When Michael Rice, the Fire Chief for the Seward County Fire Department, asked about Miller's injuries, Eikenberry told him that Miller fell the night before and hit his head on a table.

After Miller was hospitalized, his injuries were photographed by Jimmy Sellars, a Sheriff's deputy. Sellars described Miller's head injuries as "bruises, dried blood, [and] red marks." After receiving medical attention, Miller was placed on life support. Miller was diagnosed with fatal skull fractures. With the consent of Miller's family, Miller was taken off life support and died.

*Forensic Evidence*

One day later, agents from the Kansas Bureau of Investigation (KBI) arrived at Eikenberry's residence to investigate Miller's death. During the investigation, a KBI agent took dozens of photographs depicting red-brown stains on the walls, the floor, clothing, a rag, and a cattle prod. KBI agents also found clothing and a blanket with red-brown stains in a dumpster outside of Eikenberry's home, but those items may have been from Eikenberry cleaning up after Miller was hospitalized.

James Newman, a KBI forensic scientist, took samples of the red-brown stains for DNA testing which showed them to be blood. Further testing indicated that some of the blood samples were not of human origin. Newman determined that the DNA profile derived from some of the human blood samples matched Miller's DNA profile. However, some of the blood samples matched Eikenberry's DNA profile and one of the human blood samples was a mixed sample which matched the DNA profiles of both Miller and Eikenberry. Newman testified that there was no way of determining how old the various blood samples were.

At trial, Eikenberry claimed that the nonhuman blood samples were from his cutting meat or possibly from his dogs. Eikenberry claimed the blood which matched his own DNA profile was from a cut he had received when he hit his head upon being arrested. Eikenberry testified that Miller's blood was from other events. Miller suffered work-related injuries in the past and had nose bleeds, and Eikenberry said the blood spots in his house were from those incidents. Eikenberry testified that he had not cleaned up after Miller bled from those incidents and that only one blood spot was noticeable. Eikenberry admitted, however, that he had mopped up a blood spot from Miller's fatal injuries. Eikenberry's mother corroborated Eikenberry's story by testifying that she had seen Miller bleed in the house on multiple occasions. Eikenberry's father also testified that he had seen Miller bleeding in Eikenberry's home.

Dr. Hubert Peterson conducted an autopsy on Miller and noted multiple abrasions on Miller's head. The external head wounds led him to suspect that Miller died from head trauma. However, Peterson later stated that the signs of trauma were minor until the internal examination was conducted. Peterson deduced that Miller's injuries were inflicted within 24 hours of his death. Peterson concluded that blunt force trauma to Miller's head resulted in a subdural hematoma which caused Miller's death. Peterson believed that Miller was the victim of a homicide.

*Eikenberry's account*

On August 19, 2013, Jason LaRue of the KBI interviewed Eikenberry twice. During the first interview, Eikenberry told LaRue that Miller arrived at his home sometime between 3 and 5 a.m. on August 17, 2013. Eikenberry saw that Miller was "highly intoxicated." Eikenberry claimed Miller had fallen several times but was able to stand after each fall. At one point, Eikenberry and Miller got into an argument and Eikenberry slapped Miller, but Eikenberry could not remember if the slap had caused Miller to fall. According to Eikenberry, Miller eventually said he was tired and laid down to sleep with a blanket and pillow on the floor.

During his second interview, however, Eikenberry claimed that Miller fell, hit his head on the television stand, and remained on the floor until Eikenberry went to sleep. Ultimately, Eikenberry gave three different versions of Miller's fall, the slap, and whether Miller stood back up after falling. Eikenberry asserts that the discrepancies were caused by his lack of sleep and a head injury he suffered during his arrest.

*Postevidence Proceedings*

After the close of evidence, Eikenberry moved for a judgment of acquittal. The district court questioned whether sufficient evidence existed to support a second-degree murder conviction. The State argued that the jury should be instructed on second-degree murder because Eikenberry's failure to act amounted to "extreme indifference" which lead to Miller's death. The State also argued that Eikenberry acted with extreme indifference by hitting Miller and causing his injuries. The district court found that the State had failed to provide adequate proof to support a second-degree murder conviction. Thus, the district court instructed the jury only on voluntary manslaughter and involuntary manslaughter. The jury found Eikenberry guilty of involuntary manslaughter.

Eikenberry's criminal history was scored as A based on one nonperson felony and three person felonies including two 1985 juvenile adjudications for burglary. The district court denied Eikenberry's motion for a departure sentence and imposed the standard 130-month presumptive prison sentence and a 24-month postrelease supervision period. Eikenberry timely appeals.

*Does sufficient evidence show Eikenberry was guilty of involuntary manslaughter?*

Eikenberry first argues that the evidence was insufficient to support his conviction for involuntary manslaughter. Eikenberry contends that the recklessness element of involuntary manslaughter was not met because he did not create an imminent danger or disregard such a danger by slapping Miller. Additionally, Eikenberry argues that slapping Miller was not the proximate cause of Miller's death because it was not foreseeable that a slap would cause Miller's death.

Evidence is sufficient to support a conviction when the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016). On appeal, we view the evidence "in a light most favorable to the prosecution." 303 Kan. at 789. "Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations." 303 Kan. at 789 (quoting *State v. Williams*, 299 Kan. 509, 525, 324 P.3d 1078 [2014]).

Involuntary manslaughter is defined by K.S.A. 2016 Supp. 21-5405(a)(1) as the reckless killing of a human being. Intent to kill is not a required element of involuntary manslaughter. *State v. Louis*, 305 Kan. 453, 461, 384 P.3d 1 (2016). "Conduct designed to cause death—and, for that matter, conduct the actor knows is reasonably certain to cause death—is now sufficient to establish the defendant acted recklessly." 305 Kan. at 461-62 (citing K.S.A. 2015 Supp. 21-5202[c], [h], and [i]). A person acts recklessly when

6

a "person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2016 Supp. 21-5202(j).

Additionally, to convict a defendant of involuntary manslaughter, the defendant's "actions must be the proximate cause of the victim's death. [Citations omitted.]" *State v. Bale*, 39 Kan. App. 2d 655, 660, 182 P.3d 1280 (2008). The two components of proximate cause are causation in fact and legal causation. *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 420, 228 P.3d 1048 (2010). To prove causation in fact, the State must show that "but for the defendant's conduct, the plaintiff's injuries would not have occurred." 290 Kan. at 420. To prove legal causation the State must show that the "defendant's conduct might create a risk of harm to the victim and that the result of that conduct and contributing causes were foreseeable." 290 Kan. at 421.

The evidence viewed in the light most favorable to the prosecution does not compel a finding that Eikenberry merely slapped Miller, as Eikenberry contends. Instead, a rational factfinder could have found that Eikenberry inflicted blunt force trauma on Miller, causing his death. The circumstantial evidence shows that Miller was not injured before he entered Eikenberry's home that night, that Miller and Eikenberry were the only people present when Miller was injured, that Miller's blood was found throughout the residence, that Miller died from a subdural hematoma caused by blunt force trauma, and that Eikenberry gave three different stories as to how Miller injured his head.

The evidence further shows that Miller and Eikenberry had been drinking and got into an argument. Miller's injuries were severe and fatal. The jury was not compelled to believe that such injuries were self-inflicted or were caused by an accidental fall or a slap. Based on the evidence, the jury could have reasonably and logically inferred that Eikenberry caused the injuries that led to Miller's death by striking Miller multiple times

7

in the head. Doing so is a reckless act because striking another in the head constitutes conduct that is reasonably certain to cause death. See *Louis*, 305 Kan. at 461-62.

Eikenberry's conduct was also the proximate cause of Miller's death because but for the head trauma, Miller would not have died. See *Puckett*, 290 Kan. at 420. Additionally, it is foreseeable that striking another person in the head could result in life-threatening head trauma. See 290 Kan. at 421. A juror could find beyond a reasonable doubt that Eikenberry recklessly inflicted Miller's head injuries and that the injuries were the proximate cause of Miller's death. We thus find sufficient evidence to support Eikenberry's involuntary manslaughter conviction. We find it unnecessary to address the State's contention that Eikenberry's failure to attend to Miller's need for medical attention also amounted to "extreme indifference" which led to Miller's death, independently justifying his involuntary manslaughter conviction.

*Was Eikenberry's sentence based on a miscalculated criminal history score?*

Eikenberry next argues that his sentence is illegal because the district court miscalculated his criminal history score as A. Eikenberry contends that his sentence for involuntary manslaughter should have been based on a criminal history score of C. Eikenberry asserts that the district court erred by treating his two 1985 juvenile adjudications for burglary as person felonies which elevated his criminal story score to A, but those adjudications cannot be classified as person felonies because the 1985 burglary statute did not require entry into a dwelling to complete the crime of burglary.

The State concedes that the district court erred by treating Eikenberry's two 1985 juvenile adjudications for burglary as person felonies and that Eikenberry's criminal history score should have been C instead of A.

We agree. See *State v. Dickey*, 301 Kan. 1018, 1039-40, 350 P.3d 1054 (2015) (holding pre-KSGA convictions and juvenile adjudications of burglary under K.S.A. 21-3715 must be classified as nonperson felonies); accord *State v. Donaldson*, 306 Kan. 514, 515, 394 P.3d 1180 (2017). Accordingly, we remand for resentencing with directions to reclassify Eikenberry's pre-KSGA burglary adjudications as nonperson felonies.

*We do not reach other issues in this case*

Eikenberry makes two other arguments on appeal: (1) under K.S.A. 2016 Supp. 21-6810, his juvenile adjudications retroactively decayed so they cannot be used in calculating his criminal history score; and (2) increasing his criminal sentence was unconstitutional because it relied on juvenile adjudications that were not proved beyond a reasonable doubt to a jury.

We agree with the State that these issues are moot because the State has conceded error in the way Eikenberry's juvenile adjudications were counted and agrees that Eikenberry's criminal history score is C. See *State v. Hilton*, 295 Kan. 845, 849, 286 P.3d 871 (2012). Eikenberry has not shown that deciding either of these two other issues would have any effect on his sentencing.

Conviction affirmed, sentence vacated, and case remanded with directions.