NOT DESIGNATED FOR PUBLICATION

No. 122,623

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JULIO XAN SAQUIC,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Seward District Court; LINDA P. GILMORE, judge. Opinion filed June 4, 2021. Affirmed.

*James C. Dodge*, of Sharp McQueen P.A., of Liberal, for appellant.

*Russell Hasenbank*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., GREEN and BUSER, JJ.

PER CURIAM: A jury found Julio Xan Saquic guilty of, among other things, involuntary manslaughter while driving under the influence of alcohol when Saquic ran over and killed Jose Ramos. After Saquic's conviction was affirmed on appeal, he moved under K.S.A. 60-1507, alleging ineffective assistance of trial counsel. He argues that his counsel was ineffective for failing to request a jury instruction on causation. That is, what

1

was the proximate cause of Ramos' death? Because Saquic fails to show that he was prejudiced by his counsel's deficient performance in failing to request this causation instruction, we affirm the trial court's denial of his K.S.A. 60-1507 motion.

*Factual and Procedural Background*

This court previously described the facts of this case in *State v. Saquic*, No. 116,030, 2017 WL 5616934 (Kan. App. 2017) (unpublished opinion). The following paragraphs outline an abbreviated version of the facts relevant to Saquic's present motion.

In January 2015, the State charged Saquic with involuntary manslaughter while driving under the influence of alcohol or drugs, in violation of K.S.A. 2014 Supp. 21-5405(a)(3); failure to stop and remain at the scene of an accident resulting in death, in violation of K.S.A. 2014 Supp. 8-1602(a), (b)(4); driving without a driver's license, in violation of K.S.A. 2014 Supp. 8-235; and driving under the influence of alcohol or drugs, in violation of K.S.A. 2014 Supp. 8-1567(a)(3).

Dr. Hubert Peterson performed the autopsy on Ramos. The police told Dr. Peterson that Ramos was lying in the street when he was struck. Blood tests obtained from Ramos' body showed that he had a blood alcohol content between .333 and .414 when he died. Dr. Peterson testified that if Ramos was lying in the road, it would be consistent with someone passing out from alcohol poisoning.

Also, Dr. Peterson noted that Ramos had experienced some bleeding from his brain. Although Dr. Peterson testified that the bleeding could have been caused by Ramos hitting his head on the pavement when he passed out, Dr. Peterson believed this was unlikely. Dr. Peterson was unable to confirm if Ramos was standing or lying down when

2

the car struck him. Moreover, Dr. Peterson could not rule out that Ramos may have died of alcohol poisoning. Ramos' drug screen was also positive for cocaine.

Dr. Peterson, however, determined that the cause of death of Ramos was due to a combination of massive injuries, which were predominately located in his left chest region. And Dr. Peterson further opined that Ramos' injuries were consistent with being run over by a car.

Officer Mark West of the Liberal Police Department testified that acceleration marks were on the road leading up to and beyond Ramos' body. Detective Jason Ott testified that damage to the license plate on Saquic's car was not consistent with Ramos lying down when he was struck by the car. Officer Nancy Baez, however, testified that she believed Ramos was on the street before he was struck by the car.

Saquic's trial counsel's strategy was to place doubt as to whether Ramos was killed after being struck by Saquic's car. Nothing in the record shows that Saquic disagreed with his counsel's strategy. During the jury instruction conference, defense counsel did not ask the trial court for an instruction on causation.

A jury found Saquic guilty of all four counts. The trial court dismissed the conviction for driving under the influence. The trial court dismissed this conviction because it was multiplicitous with Saquic's involuntary manslaughter conviction.

Saquic timely appealed his conviction. He argued that the trial court committed clear error when it failed to give jury instructions on causation and on driving under the influence as a lesser included offense of involuntary manslaughter while driving under the influence. Saquic also challenged the sufficiency of the evidence for his convictions for involuntary manslaughter while driving under the influence of alcohol and failing to

3

stop and remain at the scene of an accident resulting in death. This court affirmed the trial court, finding no error. 2017 WL 5616934, at *1.

Then, Saquic moved pro se under K.S.A. 60-1507. After a preliminary hearing, the trial court ruled that defense counsel's performance was deficient but Saquic was not prejudiced by the deficiency. The trial court denied Saquic's motion.

Saquic timely appeals.

*Was Trial Counsel Ineffective for Failing to Request a Jury Instruction on Causation?*

Saquic argues that he was prejudiced by his trial counsel's failure to request a causation jury instruction. He argues that the jury may have reached a different conclusion if instructed to consider the proximate cause of the victim's death. On the other hand, the State contends that the jury would have reached the same outcome if an instruction on causation had been given to the jury.

A trial court has three options when handling a K.S.A. 60-1507 motion:

> "'(1) The court may determine that the motion, files, and case records conclusively show the prisoner is entitled to no relief and deny the motion summarily; (2) the court may determine from the motion, files, and records that a potentially substantial issue exists, in which case a preliminary hearing may be held. If the court then determines there is no substantial issue, the court may deny the motion; or (3) the court may determine from the motion, files, records, or preliminary hearing that a substantial issue is presented requiring a full hearing.' [Citations omitted.]" *White v. State*, 308 Kan. 491, 504, 421 P.3d 718 (2018).

The standard of review depends upon which of these options a trial court used. *White*, 308 Kan. at 504.

4

If the trial court holds a preliminary hearing where it admits limited evidence and considers arguments of counsel, the appellate court must give deference to any factual findings made by the trial court and apply a findings of fact and conclusions of law standard of review to determine whether the findings are supported by substantial competent evidence and whether those findings are sufficient to support its conclusions of law. *Bellamy v. State*, 285 Kan. 346, 354, 172 P.3d 10 (2007). The appellate court, however, has unlimited review over the trial court's conclusions of law and its decision to grant or deny the K.S.A. 60-1507 motion. *White*, 308 Kan. at 504.

When the trial court summarily denies a K.S.A. 60-1507 motion based on only the motions, files, and records after a preliminary hearing, the appellate court is in just as good a position as the trial court to consider the merits. Thus, the standard of review is de novo. *Grossman v. State*, 300 Kan. 1058, 1061, 337 P.3d 687 (2014).

After a full evidentiary hearing on a K.S.A. 60-1507 motion, the district court must issue findings of fact and conclusions of law concerning all issues presented. Supreme Court Rule 183(j) (2021 Kan. S. Ct. R. 239). An appellate court reviews the court's findings of fact to determine whether they are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. Appellate review of the district court's ultimate conclusions of law is de novo. *State v. Adams*, 297 Kan. 665, 669, 304 P.3d 311 (2013).

To be entitled to relief under K.S.A. 60-1507, the movant must establish by a preponderance of the evidence either: (1) "the judgment was rendered without jurisdiction"; (2) "the sentence imposed was not authorized by law or is otherwise open to collateral attack"; or (3) "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral

5

attack." K.S.A. 60-1507(b) (grounds for relief); Supreme Court Rule 183(g) (2021 Kan. S. Ct. R. 239) (preponderance burden).

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." This guarantee includes the right to more than the mere presence of counsel but also the effective assistance of counsel. The purpose of the effective assistance guarantee "'is simply to ensure that criminal defendants receive a fair trial.'" *State v. Galaviz*, 296 Kan. 168, 174, 291 P.3d 62 (2012) (quoting *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984]).

"To prevail on a claim of ineffective assistance of trial counsel, a criminal defendant must establish (1) that the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice, i.e., that there is a reasonable probability the jury would have reached a different result absent the deficient performance. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014) (relying on *Strickland*, [466 U.S. at 687])." *State v. Salary*, 309 Kan. 479, 483, 437 P.3d 953 (2019).

A reasonable probability means a probability sufficient to undermine confidence in the outcome. *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015).

The trial court here held that trial counsel's failure to request a causation instruction was deficient performance. The State concedes that Saquic has established the first prong of his ineffective assistance of counsel claim. Thus, because the deficiency prong has been met, it has been removed from this dispute. The State, however, argues that Saquic has not met the prejudice prong of his claim.

On the other hand, Saquic argues that he has met the prejudice prong because the jury was not told that they could consider the actions of the victim—lying in the street at

night with a dangerously high blood alcohol content and cocaine in his system—as the proximate cause of his death.

Involuntary manslaughter while driving under the influence is a strict liability crime in that no showing of criminal intent is required. *State v. Collins*, 36 Kan. App. 2d 367, 370, 138 P.3d 793 (2006). Contributory negligence is not a defense to involuntary manslaughter. Nevertheless, a victim's own conduct may be so substantial a factor that it is the proximate cause of death. See *State v. Bale*, 39 Kan. App. 2d 655, 658-60, 182 P.3d 1280 (2008). In some instances, a victim's contributory negligence may have intervened between a defendant's conduct and the fatal result. In such cases, the victim's negligence supersedes the defendant's conduct and becomes the proximate cause of the victim's death. *State v. Chastain*, 265 Kan. 16, Syl. ¶ 7, 960 P.2d 756 (1998).

We draw guidance from our *Collins* and *Bale* decisions as to whether a victim's actions or nonactions can contribute to or be the proximate cause in the victim's death.

In *Collins*, Brian M. Collins was charged with involuntary manslaughter after he drove under the influence of alcohol and hit a motorcycle. The motorcyclist had stopped in the middle of the road and walked away to urinate. His passenger, however, remained sitting on the back of the motorcycle. Collins collided with the stationary motorcycle, killing the passenger.

At trial, Collins called an accident reconstruction expert who testified that the accident would have occurred even if Collins had not been intoxicated. In arriving at this conclusion, the expert witness considered the truck's braking ability; the placement of the motorcycle in the road; its location just beyond a curve in the road; the time of the accident; the reaction time of a normal, unimpaired driver; and the stopping distance for the truck at 55 mph. Collins' theory of the case was the following:  Because the

7

motorcycle had stopped in the middle of the road, the position of the motorcycle was the proximate cause of the accident. The trial court gave the jury a proximate cause instruction. And the jury found Collins guilty of the lesser included offense of driving under the influence of alcohol.

The State argued on appeal that a proximate cause instruction was inappropriate because involuntary manslaughter while driving under the influence is a strict liability crime. The *Collins* court, however, concluded that under the facts here, the trial court did not err when it gave the jury the proximate cause instruction. The *Collins* court reasoned and held that Collins was entitled to an instruction on his theory of the case, even if the evidence supporting his defense was slight. 36 Kan. App. 2d at 372.

But in *Bale*, Rachelle Bale consumed "three or four beers" before backing up her car and killing her son, Shawn. 39 Kan. App. 2d at 658. On appeal, Bale argued that the court should have instructed the jury on "'whether Shawn's death occurred as a proximate result of Ms. Bales' operation of a vehicle while under the influence of alcohol, or whether there was an intervening cause, Shawn's act of crawling behind the car.'" 39 Kan. App. 2d at 659-60. The *Bale* court held that the instruction on an intervening cause was inappropriate because there was "no evidence whatsoever" about what the victim was doing or how he may have contributed to causing his death. 39 Kan. App. 2d at 661. Bale only speculated about what her son may have been doing immediately before the accident. Also, "neither in opening statements nor in closing arguments did either party refer to any conduct whatsoever by [Shawn] or suggest that [Shawn] was negligent in bringing about his own death." 39 Kan. App. 2d at 661.

En route to its ruling here, the trial court pointed out facts of the following:

"The trial transcript reflects that Dr. Peterson testified the cause of death was Ramos' massive injuries which were consistent with being run over by an automobile. Dr. Peterson

agreed it was possible that victim Ramos *may* have been passed out in the street when he was ran run over. However, evidence of the direct cause of Ramos' death was also presented to the jury. The evidence included the following: Saquic's vehicle struck Ramos; dragged Ramos' body 20 to 30 feet; and finally, that his massive trauma injuries, consistent with being struck by a vehicle, caused his death. Further evidence was presented that Ramos' injuries were consistent with being run over by an automobile. Blood from Ramos was found on the driver's side of the vehicle and underneath the vehicle near the tire."

Also, the trial court noted the following: "The jury heard evidence that Ramos' blood alcohol was within range for fatal alcohol poisoning and that he may have passed out on the road. The jury was presented with evidence of Ramos' conduct and still convicted Petitioner of the most severe charges for which it was instructed."

At trial, Saquic focused on the question of whether Ramos was still alive when the car hit him. In denying his K.S.A. 60-1507 motion, the trial court pointed out that in Saquic's counsel's closing argument, he maintained that Ramos was already dead when Saquic's car struck him:

"Living people don't lie down in the street, that's not where we take naps. That's not where we decide to rest.

"Now, I asked each officer whether or not they knew if Ramos was alive prior to being drug in the street. Each of you heard that . . . . No, they don't know if he was alive. They don't know if he was alive prior to being drug down the street.

"And if you are trying to decide on manslaughter or a homicide, you need to know if that person was alive or not."

The trial court's instruction to the jury on involuntary manslaughter while driving under the influence of alcohol read as follows:

9

"The defendant is charged with involuntary manslaughter. The Defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. The defendant killed Jose Ramos.

"2. It was done in the commission of driving under the influence of alcohol.

"3. This act occurred on or about the 24th day of January, 2015 in Seward County, Kansas.

"The elements of driving under the influence of alcohol are listed in Instruction No. 9."

If the jury had determined that Ramos was already dead before the collision happened, the jury would have found Saquic not guilty of involuntary manslaughter while driving under the influence of alcohol. Yet, we know that the jury did the opposite and found Saquic guilty of involuntary manslaughter while driving under the influence of alcohol. Indeed, when the trial court grounded its conclusion that the outcome would have been the same even if the jury had been given a causation instruction, the court stated:

"The jury was given the opportunity to convict Saquic of the lesser included crimes of vehicle homicide or simply operating a vehicle under the influence of alcohol. The jury still found under the submission of all evidence that Petitioner caused Ramos' death by running over him, despite being presented with other scenarios as to the cause of Ramos' death."

Indeed, there is no medical evidence to rebut Dr. Peterson's opinion on Ramos' cause of death: that the cause of death of Ramos was due to a combination of massive injuries, which were consistent with being run over by a car.

10

Yet, the dissent notes that Ramos could have died from alcohol poisoning based on the testimony of Dr. Peterson. The possibility that Ramos could have died of alcohol poisoning is not based on a solid evidentiary fact. It is based on a supposition because the record is devoid of any testimony by Dr. Peterson that alcohol poisoning contributed to Ramos' cause of death. A jury is not allowed to reach its verdict based on speculation or conjecture; thus, there must be evidence on which the jury's conclusion may be logically based. See *Jewett v. Miller*, 46 Kan. App. 2d 346, 353, 263 P.3d 188 (2011). The evidence here shows that Ramos suffered his death at the hands of Saquic by running over Ramos with a car.

These facts here more closely align with *Bale* than with *Collins*. In *Collins*, Collins presented experts to show that an unimpaired driver would have also hit the victim. Although a defendant has no burden of proof, Collins helped his case in a way Saquic did not. Saquic and Ramos were at the same party at the same house. Saquic backed out of the driveway of that house, vomited on the street, and then drove south. He hit Ramos before he arrived at the first cross street, that is, before he had gone a city block. Saquic did not show, or even argue, that a reasonably prudent, nonintoxicated driver would have done the same. We hesitate to include these facts for fear of appearing to shift the burden of proof onto the defendant. Of course, neither Collins nor Saquic had a burden to prove that he was not at fault. But Collins chose to present that theory of the case and presented expert evidence to support it. We do not fault Saquic for failing to produce similar evidence. We simply compare the facts in those cases to point out which theory of defense Saquic pursued and which he did not. It is only in his K.S.A. 60-1507 motion that Saquic now argues that Ramos himself could have caused the collision which caused his death. Saquic never argued at trial that this collision was unavoidable because of Ramos' negligent conduct.

11

On the other hand, in *Bale*, Bale only speculated that her son caused the accident by crawling under the car when there was no evidence that her son crawled under the car. Admittedly, the speculation differs here. In this case, Saquic's assertion that Ramos was lying face down in the road at 11 p.m. is not speculation because evidence supports that conclusion. Instead, Saquic speculates about whether Ramos' act of lying in the street superseded Saquic's act of driving drunk; that is, whether a reasonably prudent, nonintoxicated driver would have still hit Ramos in the street. And this speculation only now arises in Saquic's K.S.A. 60-1507 motion. No testimony from any witness on direct or cross-examination suggested that Ramos' act of lying in the street would have caused an unimpaired driver who was less than a block away to run over him. Saquic also did not argue this possibility in opening or closing arguments.

Because the record does not support Saquic's theory that Ramos' act of lying in the street superseded his act of driving while intoxicated, Saquic fails to show a reasonable probability that the outcome of trial would have been different if his counsel had requested an instruction on proximate cause. Thus, the trial court properly denied Saquic's K.S.A. 60-1507 motion because he failed to show that he was prejudiced by his trial counsel's failure to request a causation instruction.

For the preceding reasons, we affirm.

Affirmed.

* * *

GARDNER, J., dissenting: I respectfully dissent. I do not share the degree of confidence the majority has that the instruction error did not affect the outcome.

12

As the majority states, the trial court held and the State concedes that trial counsel's failure to request a causation instruction was deficient performance. "'Deficient performance' means 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.' *Strickland*, 466 U.S. at 687." *State v. Coones*, 301 Kan. 64, 70, 339 P.3d 375 (2014).

Had the causation instruction not been appropriate, the attorney would not have been deficient for failing to request it. So it has already been determined that the causation instruction Saquic seeks was both legally appropriate and factually appropriate. See *State v. McLinn*, 307 Kan. 307, 317-18, 409 P.3d 1 (2018). Determining that an instruction is factually appropriate requires the court to "determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction." *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012). So we must begin with the premise that, viewing the evidence in the light most favorable to Saquic, the evidence was sufficient for a rational fact-finder to find in Saquic's favor. Instead, the majority concludes: "Because the record does not support Saquic's theory that Ramos' act of lying in the street superseded his act of driving while intoxicated, Saquic fails to show a reasonable probability that the outcome of trial would have been different if his counsel had requested an instruction on proximate cause." Slip op. at 12.

Several of our cases have fleshed out what such a causation instruction should have required of the jury.

"In *State v. Gordon,* 219 Kan. 643, 653, 549 P.2d 886 (1976), we stated:

"'While contributory negligence is no defense in a prosecution for vehicular homicide, it is a circumstance to be considered along with all other evidence to determine whether appellant's conduct was or was not the proximate cause of decedents' deaths. In

13

some instances, a decedent's contributory negligence may have been a substantial factor in his death and a superseding cause thereof; it may have intervened between a defendant's conduct and the fatal result so as to be itself the proximate cause. [Citations omitted.]'

"The same situation applies to involuntary manslaughter where an automobile is concerned. See *State v. Betts,* 214 Kan. 271, 278, 519 P.2d 655 (1974). In *Betts,* we held that contributory negligence is not a defense in a homicide case but noted that a jury could acquit if it found that the victim's conduct was the sole cause of the death and that the defendant's drinking had nothing to do with it." *State v. Chastain*, 265 Kan. 16, 24, 960 P.2d 756 (1998).

In *Chastain*, the trial court instructed the jury that the issue of the decedent's fault was to be considered along with other evidence to determine whether the defendant's conduct was the direct cause of the decedent's death.

Similarly, in *State v. Collins*, 36 Kan. App. 2d 367, 372, 138 P.3d 793 (2006), a panel of this court found that although the involuntary manslaughter statute does not require a showing of specific criminal intent,

"there must be evidence that the conduct of the defendant was the cause of the victim's death. Given the evidence, and Collins' argument, that the sole cause of the accident was Curtis sitting on a stationary motorcycle in the middle of the road at night with no warning for a reasonably prudent, nonintoxicated approaching driver, the district court did not err in instructing the jury on proximate cause.

". . . Instead of adding paragraphs 3 and 4 to the elements instruction, the trial court should have instructed the jury: 'The fault or lack of fault of Robyn Curtis is a circumstance to be considered along with all the other evidence to determine whether the defendant's conduct was or was not the direct cause of Robyn Curtis' death.' See *Chastain*, 265 Kan. at 25."

14

That is the kind of instruction that the court should have given here. Instead, the jury had no instruction about whether to ignore or to consider Ramos' conduct or how Ramos' conduct could affect the causation analysis.

That brings us to the controlling question of prejudice. The majority mainly relies on four reasons for not finding prejudice. But I am not persuaded.

First, the majority finds that Saquic only speculated that Ramos' negligent conduct may have led to his death. True, Saquic presented no expert to make his case, but the record does contain some facts supporting his theory of defense. The jury could have credited testimony that Ramos was lying down in the street after 11 p.m. in January. Dr. Peterson testified that his report showed Ramos was lying in the street when he was struck by the car, and that it seemed he was intoxicated and was in the street "secondary" to that. He agreed that Ramos may have been passed out on the street.

When asked about the possibility that Ramos could have died from alcohol poisoning, Dr. Peterson responded: "I can't definitely rule out 100 percent that he did not die from it but it would appear to be that it was—the intoxication was concomitant with the final event of the trauma to the chest and head."

Other witnesses did not know whether Ramos was alive or dead before being hit by the car.

If Ramos were alive, lying in the street at night with no warning for a reasonably prudent, nonintoxicated approaching driver, he was negligent and his negligence contributed to his death. If Ramos were dead from alcohol poisoning before Saquic's car hit him, Ramos' acts alone caused his death. "[A defendant] is entitled to an instruction on his theory of the case even if the evidence that supports his defense is slight." *Collins*, 36

15

Kan. App. 2d at 369, 372 (finding a defendant charged with involuntary manslaughter while driving under the influence of alcohol was entitled to have the jury instructed on causation).

Second, the majority finds that the record contains no evidence whether Ramos was standing up or lying down in the street when he was struck by the car. This fact matters only because if Ramos was standing up, he was alive. But the record does contain some evidence about that fact. Dr. Peterson testified that his report showed Ramos was lying in the street when he was struck by a vehicle—officers had told him that. No evidence shows Ramos was standing up when he was hit. Ott never stated that Ramos was likely standing up when he was hit, but he did testify that the damage to the license plate bracket is higher up than if the victim had been lying on the ground. But no facts establish when that bracket was broken. Facts do show there was no blood or hair on it. "The vehicle's license plate frame was broken on the top and bottom, but there was no blood or hair on the license plate. Additionally, there was no damage to the vehicle's hood, windshield, or roof." *State v. Saquic*, No. 116,030, 2017 WL 5616934, at *2 (Kan. App. 2017) (unpublished opinion). It is reasonable to infer that had Ramos been standing up when the car hit him, the car would have sustained some damage to its hood, windshield, or roof. Based on this evidence, Ramos was lying in the street when he was hit.

Third, the majority finds no medical evidence rebutting Dr. Peterson's opinion that the cause of Ramos' death was "a rapid demise secondary to these massive injuries, predominantly situated in the left chest" consistent with being run over by a car. True, the defendant presented no dueling expert, but Dr. Peterson also gave medical testimony supporting Saquic's theory. He agreed:

16

- Ramos could have died from alcohol poisoning;
- Ramos had a blood alcohol content of .333-.414;
- Ramos' blood alcohol content was consistent with him losing consciousness from alcohol poisoning;
- Ramos had a brain bleed that, although unlikely, could have been caused by his hitting his head on the pavement when he passed out; and
- Ramos' drug screen was positive for cocaine.

The parties do not dispute that Saquic's car ran over Ramos, so the fact that Ramos sustained massive injuries consistent with being run over by a car does nothing to answer the question whether he died because of those injuries or because of alcohol poisoning. On that topic, what Dr. Peterson did not testify to is also significant. He did not testify:

- Ramos was alive when Saquic's car hit him;
- Ramos was able to stand despite his blood alcohol content; or
- that he had determined within a reasonable degree of medical certainty what caused Ramos' death.

The main problem with all three of the preceding reasons relied on by the majority is that they weigh the facts supporting Saquic's theory of defense—that Ramos was dead before he hit him. And doing so contradicts the established finding that a factual basis exists for giving the causation instruction. Were it not so, the trial attorney would not have been found deficient for failing to request the instruction. And a panel of this court already found evidence supporting Saquic's theory, when addressing Saquic's claim on direct appeal of insufficient evidence:

"The jury heard evidence of both possible scenarios and found the scenario in which Saquic caused the death of Ramos by running over him to be more credible. It is not our

17

place to reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility. See *Dunn*, 304 Kan. at 822." *Saquic*, 2017 WL 5616934, at *5.

So the factual attacks are misplaced. We cannot reweigh the evidence.

Lastly, the majority relies on the fact that the jury chose to convict Saquic of the most severe crime on which it was instructed (involuntary manslaughter) even though it could have convicted him of lesser crimes. This rationale might be persuasive had the jury chosen *not* to convict Saquic of the lesser charged crimes while convicting on the greater crime. But the jury *did* convict Saquic of a lesser crime:

"The State charged Saquic with one count each of involuntary manslaughter while driving under the influence of alcohol or drugs, a severity level 4 person felony; failure to stop and remain at the scene of an accident resulting in death, a severity level 6 person felony; driving without a driver's license, a class B unclassified misdemeanor; and driving under the influence of alcohol or drugs, a class B nonperson misdemeanor.

"The jury found Saquic guilty of all four charges, but, at sentencing, the district court dismissed the conviction for driving under the influence of alcohol as being multiplicitous with Saquic's involuntary manslaughter conviction." *Saquic*, 2017 WL 5616934, at *2.

Driving under the influence of alcohol is a lesser included offense of involuntary manslaughter while driving under the influence of alcohol. See *State v. Brammer*, 301 Kan. 333, 345, 343 P.3d 75 (2015). That the jury found Saquic guilty as charged suggests nothing about whether the jury would have convicted Saquic of involuntary manslaughter had it received the instruction it should have been given.

The jury was also instructed that if it did not agree that Saquic was guilty of involuntary manslaughter, it should consider the lesser offense of vehicular homicide.

18

But one of the elements to establish that charge was proof "[t]hat the defendant killed Jose Ramos by the operation of an automobile." Had the jury found Saquic guilty of vehicular homicide, the same issue would arise—that the instructions erroneously failed to address causation. That the jury did not find Saquic guilty of vehicular homicide does not help determine whether the jury would have found Saquic guilty of involuntary manslaughter if it had been properly instructed.

In *Chastain*, during deliberations, the jury asked the trial court whether it should consider the fault of each driver when interpreting the phrase "unintentionally killed" in the court's instructions. 265 Kan. at 23. In response, the trial court informed the jury that it should consider the issue of the decedent's fault along with other evidence to determine whether the defendant's conduct was the direct cause of the decedent's death. The jury convicted Chastain of the lesser included offense of driving while under the influence of alcohol rather than involuntary manslaughter while driving under the influence of alcohol. So giving the desired causation instruction evidently makes a difference in some cases.

The majority finds this case comparable to *State v. Bale*, 39 Kan. App. 2d 655, 182 P.3d 1280 (2008). But in *Bale*, the court gave the desired causation instruction:

> "'Contributory negligence of Shawn Casey is no defense. It is a circumstance to be considered along with all other evidence to determine whether [Bale's] conduct was or was not the direct cause of Shawn Casey's death. Shawn Casey's negligence may have been such a substantial factor in his death as to be itself the cause.'" 39 Kan. App. 2d at 659.

Bale also wanted a jury instruction to determine "whether Shawn's death occurred as a proximate result of Ms. Bale's operation of a vehicle while under the influence of alcohol, or whether there was an intervening cause, Shawn's act of crawling behind the car." 39

19

Kan. App. 2d at 659-60. The court rejected that instruction because it found "a total lack of evidence of conduct by Casey, negligent or otherwise, which could have brought about his own death, [so] the notion of intervening cause simply does not come into play." 39 Kan. App. 2d at 661. In contrast, we have some evidence that Ramos' conduct could have brought about his own death.

Given the totality of the facts, I find a reasonable probability the jury would have reached a different result without the deficient performance, meaning a probability sufficient to undermine my confidence in the outcome.