No. 94,128

STATE OF KANSAS, *Appellee,* v. BRYON J. KIRTDOLL, *Appellant.*

(136 P.3d 417)

Opinion filed June 9, 2006.

*Patrick H. Dunn*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Amy M. Memmer*, assistant district attorney, argued the cause, and *Robert D. Hecht*, district attorney, and *Phill Kline*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: A jury convicted Bryon J. Kirtdoll of premeditated first-degree murder and two counts of aggravated battery for his involvement in a nightclub shooting. The district court sentenced him to life in prison without the possibility of parole for 50 years (the hard 50) for the first-degree murder conviction and two 41-month sentences for the aggravated battery convictions. The sentences were ordered to run consecutively. Kirtdoll appeals his convictions and sentences directly to this court pursuant to K.S.A. 22-3601(b)(1) (convicted of off-grid crime).

The issues on appeal, and our accompanying holdings, are as follows:

1. Did the district court err in determining that Kirtdoll's statement to Detective Volle was freely and voluntarily given? No.

2. Did the district court err in allowing Demetria Rucker to testify? No.

3. Did the district court err in instructing the jury on eyewitness identification testimony? No.

4. Is the Kansas hard 50 sentencing scheme unconstitutional? No.

5. Did the district court violate double jeopardy in applying the K.S.A. 2005 Supp. 21-4636(b) aggravating factor to impose Kirtdoll's hard 50 sentence? No.

Accordingly, we affirm the district court.

## FACTS

On February 2, 2003, at approximately 11:45 p.m., Christine Willmore went to RP's nightclub in Topeka with her friend Antoinette Claiborne. RP's was filled to its capacity of 299 people. While waiting to get in, Willmore and Claiborne met Claiborne's sister, Angela O'Neal.

Willmore danced throughout the evening and consumed two drinks. She danced in a circle with a group of women including Claiborne and O'Neal. Although the club was dark, Willmore could "see people's face[s]."

After the song "In the Club" began playing, Willmore "heard five bangs and then everybody yelled to get down." During this time, "[e]verybody was pushing and moving and yelling and screaming." Willmore fell down; when she tried to stand, she realized she had been shot in the leg.

Willmore noticed a man lying on the floor on his back near her. She held the man's feet, because she was afraid that he was going to kick her. She later learned that the man was Michael Yates, the victim killed in the shooting.

Willmore's friend Claiborne also heard the gunshots at approximately 1:30 a.m. while she was dancing with Willmore, O'Neal, Yates, and a group of females approximately 10 feet from the back door of the club. Claiborne believed the shots came from her left. After she attempted to move Willmore off of the floor, Claiborne pushed her sister, Angela O'Neal, out of the club. At that time, Claiborne realized she had been shot in the thigh. Although she

did not see who was shooting, she believed the shooter was wearing dark clothes and a hood.

Lakisha Brooks went to RP's between 11:30 p.m. and 12:15 a.m. with her cousin, Demetria Rucker. At some point, Brooks' cousin, Michael Yates, entered the club and approached her. Yates talked with Brooks for a couple of minutes prior to heading to the bar to get a drink.

Brooks then went onto the dance floor with Yates and others. While Brooks was dancing, she saw Bryon Kirtdoll attired in dark, puffy clothes. She saw him do "something with his hand. He pulled something out from his face and then he just started aiming and then he started shooting . . . ." Brooks immediately fell to the floor and heard five to seven shots total.

After the shooting stopped, Brooks found Yates lying on the floor. According to Brooks, Yates told her "cuz, that nigger shot me. That nigger shot me." She spoke to Yates for 4 or 5 minutes until the police arrived.

Brooks had known Kirtdoll for 6 or 7 years and usually called him "Blu" instead of Bryon. She also referred to Kirtdoll as her cousin, although they were not related. Brooks' relationship with Kirtdoll "was cool until the last year or year and a half." According to her, Kirtdoll and Yates were acquainted, and were "all right until a year and a half ago."

Brooks' cousin, Demetria Rucker, had been a childhood friend of Kirtdoll and knew him as "Blue" or "Tru." Rucker stated that her relationship with Kirtdoll was "cool" and that she did not have any problems with him. She also had known Yates since middle school; he was her children's cousin.

According to Rucker, when the song "In the Club" began, she stood by the VIP section near the back door. She heard a loud banging at the back door; she then observed Kirtdoll enter the club after Robert Rose, also known as "Bear," opened the back door. Kirtdoll, who was wearing a black hood, pulled a gun from his right pocket and started shooting. Rucker heard six shots. After the shooting ended, she did not see Kirtdoll in the club.

Robert Rose was standing near the back door and opened it after he heard a knock; Kirtdoll entered. According to Rose, Kirtdoll

was wearing a black nylon coat with a hood. After Kirtdoll came inside the club, Rose walked away from the back door because the "vibe" did not feel right to him. After he took a couple of steps, he heard four or five gunshots. Rose fell to the ground before he fled out the front door. He did not see Kirtdoll again.

Krystal Barber saw Yates at the club, but they did not speak to each other. She knew Yates because they had been in a romantic relationship and had a daughter together. Barber also knew Kirtdoll, whom she called "Blu" or "Tru," from a previous romantic relationship.

According to Barber, she was standing near the back door when she saw Kirtdoll enter. He was 5 to 6 feet away wearing a black "hoody" with the hood up as well as a team jacket. She thought Kirtdoll looked "suspicious" and he "had his hands in his pockets." When he walked onto the dance floor, Barber turned away. When she heard gunshots, she turned around and saw Kirtdoll standing over Yates while shooting. She then saw Kirtdoll run out the back door.

Jesse Klinefelter was the club DJ that night. When the shots were fired, he was inside the DJ booth. According to Klinefelter, he did not see the shooter but saw "[b]right flashes of light" and heard "five to seven shots" coming from the back door area. He then took cover and called 911 on his cell phone. After Klinefelter left the booth, he saw Yates lying on the floor. Because he saw that Yates had bullet holes in his back, he applied pressure to try to stop the bleeding. According to Klinefelter, Yates told him: "Tru fucking shot me."

Loretta Atwood was also present. When she heard the shots, she crawled under a pool table. Approximately 5 minutes later, she looked up and saw two men with green bandanas on their faces running out the back door. Atwood did not see who had fired the gun.

Christopher Butts was working as the club bouncer. According to him, he was in the VIP room when he heard four or five shots fired from near the back door. After the shots, he saw a black individual wearing dark clothing run out the back door. Butts gave

chase for four to five car lengths, but stopped running when he saw a police car behind the club.

Prior to the shooting, Topeka Police Officer Chris Bowers responded to a group of women fighting in front of the club. After that episode, he drove to a parking area near RP's to write an incident report and to investigate a specific car. While Bowers was looking at the car, he noticed a group of males standing outside of the club's back door. He directed his spotlight at the males and they dispersed. Dispatch then relayed that a shooting had occurred inside of the club. Once Bowers entered the club, he found Yates lying on the dance floor approximately 5 feet from the back door. Although he performed CPR, Yates did not regain consciousness. Bowers also saw a white female victim lying next to Yates.

On March 7, 2003, Kirtdoll was charged with one count of murder in the first degree for Yates' death and two counts of aggravated battery for the gunshots to Willmore and Clairborne. After he was arrested in Nevada, he was extradited back to Kansas.

The case proceeded to jury trial in January 2004. Christine Willmore, Robert Rose, Lakisha Brooks, Krystal Barber, Demetria Rucker, Angela O'Neal, Jesse Klinefelter, Christopher Butts, Antoinette Claiborne, and Officer Chris Bowers were among those testifying on behalf of the State. Loretta Atwood testified on behalf of the defense. The jury found Kirtdoll guilty of all charges. He was sentenced to life in prison without the possibility of parole for 50 years (the hard 50) for the first-degree murder conviction and two 41-month sentences for the aggravated battery convictions. The sentences were ordered to run consecutively.

## ANALYSIS

Issue 1: *Did the district court err in determining that Kirtdoll's statement to Detective Volle was freely and voluntarily given?*

The State filed a motion for a hearing under *Jackson v. Denno*, 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774 (1964), to determine the voluntariness and admissibility of a statement given by Kirtdoll to Detective Volle of the Topeka Police Department. Citing *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602

(1966), Kirtdoll argues that he did not waive his *Miranda* rights and the district court consequently erred in concluding his statement was voluntary. The State responds that his statement was voluntary because it occurred after his acknowledgment of his *Miranda* rights, and a voluntary waiver of those rights can be inferred from the surrounding circumstances, citing *North Carolina v. Butler*, 441 U.S. 369, 60 L. Ed. 2d 286, 99 S. Ct. 1755 (1979).

"In reviewing a trial court decision regarding the suppression of an accused's statements . . . , we review the factual underpinnings of the decision by a substantial competent evidence standard of review and review the ultimate legal decision drawn from those facts de novo with independent judgment. [Citation omitted.] We do not reweigh the evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. [Citation omitted.]" *State v. Mattox*, 280 Kan. 473, 480, 124 P.3d 6 (2005).

The specific question of the voluntariness of a waiver of *Miranda* rights is a question of law that we determine de novo based upon the totality of the circumstances. *State v. Mattox*, 280 Kan. at 482. When, as here, we are dealing with an implied—as opposed to an explicit—waiver, the issue of whether the defendant waived his or her *Miranda* rights can be virtually indistinguishable from the issue of whether the defendant's statement was voluntary. *Mattox*, 280 Kan. at 483.

According to the evidence at the *Jackson v. Denno* hearing—the testimony of Detective Volle and the videotape of the interview—Volle interviewed Kirtdoll while he was in custody at the law enforcement center. Volle first removed Kirtdoll's handcuffs and leg shackles. Volle asked if Kirtdoll needed anything to eat or drink, to which Kirtdoll responded no. Volle identified himself and said he assumed Kirtdoll knew why he was there. Kirtdoll nodded yes.

Volle stated that before he asked Kirtdoll any questions he needed to read Kirtdoll his *Miranda* rights. Kirtdoll admitted he had had his rights read to him before. After Volle read each right, he asked if Kirtdoll understood; Kirtdoll acknowledged that he did. When completed, Volle asked if Kirtdoll understood them all; Kirtdoll answered, "Yes." Volle then asked if Kirtdoll went by "Bryon, Blu, Tru, what?" Kirtdoll stated his name was Bryon. Volle asked what he went by, and Kirtdoll replied, "Bryon." Volle asked, "What

else?" Kirtdoll replied, "Tru." Volle then asked if he also ever went by "Blu." Kirtdoll replied "Yeah."

At that point, Volle asked Kirtdoll if he wanted to speak with Volle about the incident. Kirtdoll declined because he had no lawyer present. Volle confirmed that Kirtdoll wanted an attorney present before speaking further with Volle, and the interview terminated.

Volle admitted at the hearing that he had two purposes in asking Kirtdoll about monikers. First, it was standard practice to obtain personal information about interviewees. Second, he particularly wanted to see if Kirtdoll would admit to using the names of "Tru" and "Blu."

At the close of the hearing evidence, the district court concluded:

"THE COURT: The court for the record has reviewed the tape again for a second and actually a third time and I want to go ahead and make the following findings relative to the voluntariness of this questioning and the answers — brief answers given by the defendant.

"First of all, the tape clearly reflects that the officer asked the defendant if he needed anything, which the defendant responded he did not. And then at that point the officer gave the defendant *Miranda*. Very, very clear that he read his rights to him. Prior to that also he indicated to the defendant you know why you are here and the defendant nodded yes.

"So it was pretty obvious from reviewing those matters that there was a criminal investigation ongoing and the defendant at that point acknowledged that he knew what his rights were. And the officer then went into ascertaining his identification and whether there was any other monikers and the defendant responded affirmatively as to the monikers of Blu and Tru. And then at that point the defendant invoked his right to not make any further statements relative to this investigation.

"And the issue really only is whether or not the defendant's responses to questions as to his identity and his monikers used should be admissible. And I think it is very, very clear from the tape that he was *Mirandized*. He was in custody, but he was *Mirandized*. The tape appears that he understood the questions and showed no hesitancy in his answers and *there is nothing that I have heard or seen that suggests that he was otherwise influenced by anything else*. And that those comments then that he made were voluntary.

"So the court under *Jackson v. Denno* finds those statements are, in fact, voluntary and will allow the admissibility of same." (Emphasis added.)

In support of Kirtdoll's claim that his statement was given without a valid waiver of his rights, he quotes *Miranda*, 384 U.S. at

475: "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained."

The State responds that the Supreme Court clarified this *Miranda* passage in *North Carolina v. Butler*, 441 U.S. at 373:

"[T]he [*Miranda*] Court held that an express statement can constitute a waiver, and that silence alone after such warnings cannot do so. But the Court did not hold that such an express statement is indispensable to a finding of waiver.

"An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. *The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case.* As was unequivocally said in *Miranda*, mere silence is not enough. *That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights."* (Emphasis added.)

The *Butler* Court observed that 10 of the 11 United States Courts of Appeals and the courts of at least 17 states had held that an explicit statement of waiver was not invariably necessary to a defendant's waiver of the right to remain silent or the right to counsel. 441 U.S. at 375-76. Among the cases *Butler* cited for this general proposition was *State v. Wilson*, 215 Kan. 28, 523 P.2d 337 (1974). 441 U.S. at 375-76 n.6.

In *Wilson* this court addressed facts and a defense argument similar to these found in the instant case. There, defendant contended that the trial court erred in admitting statements he made to arresting officers about the location of a gun. We stated:

"Defendant admits the Miranda warning was given and acknowledged by him prior to his inculpatory statements. Defendant's argument seems to be that the arresting officers should have done more than merely give him the Miranda warning and should have asked him specifically if he wanted to exercise any of his rights after the warning had been given. *This argument is untenable.* Defendant gave an unequivocal 'Yes' response when asked if he understood his rights. He makes no claim that he was coerced or that his statements that the gun was in the river were given otherwise than voluntarily." (Emphasis added.) 215 Kan. at 30.

See also *United States v. Mix*, 446 F.2d 615 (5th Cir. 1971) (defendant impliedly waived *Miranda* rights because after receiv-

ing warning, he stated that he understood, and then responded to federal agent's questions by admitting ownership of the illegal firearms); see *United States v. Cardwell*, 433 F.3d 378, 389-90 (4th Cir. 2005) ("Because [defendant] had been fully informed and indicated his understanding of his *Miranda* rights, his willingness to answer Agent High's question is as clear an indicia of his implied waiver of his right to remain silent as we can imagine.").

Other than his lack of waiver, Kirtdoll makes no argument that his statement was involuntary, *e.g.*, due to his age. Nevertheless, substantial competent evidence supports the district court's findings which permit us to independently conclude that, under the totality of the circumstances, Kirtdoll's *Miranda* rights were knowingly and voluntarily waived and his statement was voluntarily and knowingly given. *Cf. Mattox*, 280 Kan. at 483 (the two inquiries can be virtually indistinguishable). Regarding the duration and manner of the interrogation and his ability on request to communicate with the outside world, the interview itself was short, as Kirtdoll invoked his right to counsel after answering the detective's first questions; there is no allegation of coercion. Regarding his age, intellect, and background, Kirtdoll was a 26-year-old adult who had previous experience with law enforcement as he was arrested in Nevada before being extradited to Kansas; he had already been in custody for several months prior to the interview. At the hearing, the judge noted that Kirtdoll had been *Mirandized* previously based upon his response to a question from Volle. There is no allegation of low intellect or of Volle's unfairness in conducting the interrogation.

Issue 2: *Did the district court err in allowing Demetria Rucker to testify?*

Kirtdoll argues that the district court violated his right to a fair trial when it allowed Demetria Rucker to testify at trial. He specifically asserts that Rucker violated a witness sequestration order issued pursuant to K.S.A. 22-2903 by sitting in the courtroom during the preliminary hearing, although she did not testify at the hearing. He further alleges that because the statutory order was violated, no prejudice need be shown but, if so, prejudice was dem-

onstrated. The State responds with a multitude of reasons why Kirtdoll's position has no merit. We need only address a few of them.

K.S.A. 22-2903 discusses the sequestration of witnesses:

"During the examination of any witnesses or when the defendant is making a statement or testifying the magistrate may, and on the request of the defendant or state shall, exclude all other witnesses. He may also cause the witness to be kept separate and to be prevented from communicating with each other until all are examined."

Under the statute, on the defendant's request, sequestration of witnesses is mandatory at a preliminary hearing. However, we have stated that at trial, sequestration is not a right; rather, it is committed to the discretion of the trial court. *State v. Heath*, 264 Kan. 557, 588-89, 957 P.2d 449 (1998). In either scenario, "a violation of a court order sequestering witnesses does not automatically disqualify a witness from testifying in the absence of any showing of prejudice to the defendant, and the trial court may in its discretion permit the witness to testify despite the violation. [Citations omitted.]" *State v. Johnson*, 258 Kan. 475, 491-92, 905 P.2d 94 (1995).

As the State notes, it endorsed approximately 300 witnesses at the time of the preliminary hearing, and defense counsel did not object at any time to the State calling Rucker as a trial witness or to her testimony. As a general rule, a party cannot raise an issue on appeal where no contemporaneous objection was made and where the trial court did not have an opportunity to rule. *State v. Flynn*, 274 Kan. 473, 502, 55 P.3d 324 (2002). Absent an objection, Kirtdoll did not properly preserve this issue for appeal.

Moreover, the following colloquy demonstrates that Kirtdoll availed himself of the opportunity to explore the possible problem during Rucker's cross-examination:

"Q. [Defense counsel] Now at the preliminary hearing, did the witnesses all stay out in the hallway so they didn't hear each other's testimony?
"A. [Rucker] Correct.
"Q. You didn't stay out in the hallway, did you, you stayed and listened, right?
"A. Yeah. But they said being that they had not handed me a subpoena yet, that therefore I can come in and testify.
"MR. HUETER [Defense counsel]: No other questions."

We acknowledge that there are several exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal, including: (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) the judgment of the trial court may be upheld on appeal despite its reliance on the wrong ground or having assigned a wrong reason for its decision. *State v. Schroeder*, 279 Kan. 104, 116, 105 P.3d 1237 (2005). Kirtdoll does not assert that any of the above exceptions are applicable to his case, however. Nor do we find any under these facts because Rucker's testimony was basically corroborated by several other witnesses.

Issue 3: *Did the district court err in instructing the jury on eyewitness identification testimony?*

Kirtdoll asserts that the district court erred in giving a jury instruction on eyewitness identification testimony based upon PIK Crim. 3d 52.20. The State again responds with a multitude of reasons why his position has no merit. We again need only address a few of them.

The district court gave the following cautionary instruction:

"The law places the burden upon the State to identify the defendant. The law does not require the defendant to prove he has been wrongly identified. In weighing the reliability of eyewitness identification testimony, you first should determine whether any of the following factors existed, and, if so, the extent to which they would affect accuracy of identification by an eyewitness. Factors you may consider are:

"1. The opportunity the witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of the time of observation, and any limitations on observation like an obstruction or poor lighting;

"2. The emotional state of the witness at the time including that which might be caused by the use of a weapon or a threat of violence;

"3. Whether the witness had observed the defendant on earlier occasions;

"4. Whether a significant amount of time elapsed between the crime charged and any later identification;

"5. Whether the witness ever failed to identify the defendant or made any inconsistent identification;

"6. The degree of certainty demonstrated by the witness at the time of any identification of the accused; and

"7. Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification."

Kirtdoll did not object to the instruction at trial. Accordingly, our standard of review under such circumstances typically is to determine if the instruction was clearly erroneous. See K.S.A. 2005 Supp. 22-3414(3); *State v. Boone*, 277 Kan. 208, 220, 83 P.3d 195 (2004). Here, however, Kirtdoll not only failed to object, but he also championed the use of the instruction over the State's objection as demonstrated by the following colloquy:

"[The Court] Next, the law places the burden upon the State to identify the defendant; number 8.

"MR. MCELHINNEY [The State]: Can we make objections at this point?

"THE COURT: Go ahead.

"MR. MCELHINNEY: I would object to the giving of this instruction. I think I made this objection before that at least in PIK and I believe in case law that the guidance is if the Court has some serious concerns about the identification of the eyewitnesses that we presented, pointed the finger at Mr. Kirtdoll have all indicated that they have known him. I think the shortest time period was seven years being Lakisha Brooks. Krystal Barber indicated that she used to date him, and we know that she has known him for some period of time. And Demetria Rucker indicated that she has known him since middle school.

"I don't believe that this instruction is warranted under the guidelines given by both the PIK committee and the Kansas Court of Appeals.

"MR. HUERTER [Defense counsel]: Judge, I think that if the only element of the factors and there are seven listed in the instruction, if the only one was number 3 that the witness had observed the defendant on earlier occasions that might have been an argument that holds water. But when you take a look at things about physical conditions, the length and time of the observation, the poor lighting, emotional state caused by use of weapons, significant amount of time between the crime and the later identification where we have a crime in February and one of his eyewitnesses gives an I.D. on Monday of this week eleven months later, *this is clearly a warranted instruction*.

"THE COURT: The Court would agree with that. The Court will keep instruction number 8. This instruction it will be labeled as number 8." (Emphasis added.)

A litigant may not invite and lead a trial court into error and then complain of the trial court's action on appeal. *State v. Hebert*, 277 Kan. 61, 78, 82 P.3d 470 (2004). Based on defense counsel's argument—in response to the State's objection—that the instruction

was warranted, Kirtdoll is barred from claiming the error on appeal.

Moreover, as the State suggested at the instruction conference, no eyewitness cautionary instruction was warranted in this case because the eyewitnesses, Brooks, Rucker, and Barber, all had known Kirtdoll before the night of shooting. As we stated in *State v. Calvin*, 279 Kan. 193, 206, 105 P.3d 710 (2005): "Where the witness personally knows the individual being identified, the cautionary eyewitness identification instruction is not necessary and the accuracy of the identification can be sufficiently challenged through cross-examination." See also *State v. Franklin*, 280 Kan. 337, 344-45, 121 P.3d 447 (2005); *State v. Mann*, 274 Kan. 670, 677-79, 56 P.3d 212 (2002).

Although an eyewitness instruction is not necessary if the eyewitness personally knows the defendant, this court has not concluded that giving such an instruction in that situation is error. See *Franklin*, 280 Kan. at 345 (no error found where an instruction was given although not warranted by the facts).

Issue 4: *Is the Kansas hard 50 sentencing scheme unconstitutional?*

Next, Kirtdoll challenges the constitutionality of the hard 50 sentencing scheme under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999). This court has de novo review of constitutional questions. *State v. Oliver*, 280 Kan. 681, 708, 124 P.3d 493 (2005).

This court has previously rejected the same challenge in numerous cases. See, *e.g.*, *Oliver*, 280 Kan. at 708; *State v. Wilkerson*, 278 Kan. 147, 160, 91 P.3d 1181 (2004); *State v. Hebert*, 277 Kan. 61, 107-08, 82 P.3d 470 (2004); *State v. Douglas*, 274 Kan. 96, 111-12, 49 P.3d 446 (2002), *cert. denied* 537 U.S. 1198 (2003). We see no reason to retreat from that position now.

Issue 5: *Did the district court violate double jeopardy in applying the K.S.A. 2003 Supp. 21-4636(b) aggravating factor to impose Kirtdoll's hard 50 sentence?*

Finally, Kirtdoll argues that the district court impermissibly used the conduct from his aggravated battery convictions as the sole aggravating factor to support his hard 50 sentence, in violation of the Double Jeopardy Clauses of the Fifth Amendment and Section 10 of the Kansas Constitution Bill of Rights.

"The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10 of the Kansas Constitution Bill of Rights protect against . . *multiple punishments for the same offense.* [Citation omitted.]" (Emphasis added.) *State v. Hanson*, 280 Kan. 709, 712, 124 P.3d 486 (2005).

As stated, this court has de novo review of constitutional questions. *Oliver*, 280 Kan. at 707.

K.S.A. 2003 Supp. 21-4635(a), the statute in place at the time of Kirtdoll's crimes, provides for court imposition of the hard 50. It states in relevant part:

"[I]f a defendant is convicted of murder in the first degree based upon a finding of premeditated murder, the court shall determine whether the defendant shall be required to serve . . . a mandatory term of imprisonment of 50 years or sentenced as otherwise provided by law."

K.S.A. 2003 Supp. 21-4635(b) directs the sentencing court to consider aggravating circumstances listed in K.S.A. 21-4636 when making the determination. Here, the district court relied upon. 2003 Supp. 21-4636(b) as the aggravating factor for imposing the hard 50 sentence, *i.e.*, whether "[t]he defendant knowingly or purposely killed or created a great risk of death to more than one person."

Kirtdoll asserts that he is being punished twice because the same conduct was used to not only increase his parole eligibility from 25 years to 50 years on the murder conviction but also to sentence him to two 41-month sentences on the aggravated battery convictions. The State responds that the aggravated battery statute, K.S.A. 21-3414 ("caused great bodily harm to another person") and K.S.A. 2003 Supp. 21-4636(b) ("knowingly or purposely . . . created a great risk of death to more than one person") proscribe different conduct. It argues that when Kirtdoll fired the gun in the crowded nightclub, he created a great risk of death to everyone

near Yates. The fact that he also caused great bodily harm to both Claiborne and Willmore did not negate the risk of death to the other individuals on the dance floor.

The district court's statements at sentencing demonstrate similar logic:

"I believe that as far as the Hard 50 issue goes, that there is no question that there is a lot of testimony to support this. That you fired several shots into a crowded dance floor and there was really no issue about that. There was no issue about the fact that Mr. Yates was dancing with a lot of girls out on this dance floor. And it was a packed nightclub, and it was a packed dance floor."

Consequently, it is clear that the district court used the firing of the shots into a crowded dance floor as the statutory aggravator, irrespective of whether the shots actually injured anyone, *i.e.*, constituted aggravated battery. Accordingly, Kirtdoll was not sentenced twice for the same offense, aggravated battery, in violation of the Double Jeopardy Clauses.

Affirmed.