No. 125,459

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JARED RAY PAYNE,
*Appellant*.

SYLLABUS BY THE COURT

1.

When analyzing jury instruction issues, appellate courts follow a three-step process: (1) determining whether the appellate court can or should review the issue, in other words, whether there is a lack of appellate jurisdiction or failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, in other words, whether the error can be deemed harmless.

2.

To find a defendant guilty of involuntary manslaughter or vehicular homicide, the jury must find the defendant proximately caused the death of the victim. The causation element is reflected in the PIK instructions for each offense, although the trial court may also consider giving a separate jury instruction on causation more tailored to the facts of a particular case.

Appeal from Wyandotte District Court; WESLEY K. GRIFFIN, judge. Submitted without oral argument. Opinion filed January 31, 2025. Affirmed.

1

*Darby VanHoutan*, of Kansas Appellate Defender Office, for appellant.

*Garett C. Relph*, deputy district attorney, *Mark A. Dupree Sr.*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before GARDNER, P.J., MALONE and COBLE, JJ.

MALONE, J.:  Jared Ray Payne appeals his convictions of involuntary manslaughter and aggravated battery arising from a fiery car crash that killed one of his sons and injured another. The State alleged that the crash was the result of a "road rage" incident on the part of Payne involving another driver. Payne claims:  (1) The district court erred by not providing a legally and factually appropriate jury instruction on causation; (2) the district court erred in finding Payne gave a voluntary statement to the police and admitting it into evidence; (3) the prosecutor committed reversible error in closing argument by defining the terms "accident" and "road rage"; and (4) Payne was denied a fair trial based on cumulative error. After thoroughly reviewing the record, we find no reversible error and affirm the district court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 5, 2020, Payne was driving on Interstate 435 with his two sons, Ethan and Caden, a minor child. This portion of the highway was three lanes travelling in both directions. Payne's vehicle collided with a United Postal Service (UPS) semi-truck driven by Kelly White causing Payne's vehicle to hit a bridge pillar and explode into flames, resulting in Caden's death. Payne and Ethan escaped the vehicle. Both were burned, among other injuries, and taken to the hospital. There were various accounts of the events leading to the collision which were ultimately presented to the jury at Payne's trial.

*Ethan's account of the incident*

Ethan was 19 years old at the time of the crash. Before the crash, Ethan noticed a UPS truck and started paying attention when his "dad hit the brakes pretty hard." Payne was swearing and was mad because of "whatever happened with the truck." While Payne was "cussing and yelling" the UPS truck was "just driving, like, slow, under the speed limit for sure." Payne directed his yelling at the UPS truck. As Payne drove closer to the truck, he used his cellphone to try to take a picture of the UPS truck's identifying number. Payne could have avoided the truck by simply driving away, and Ethan wanted to tell his father to "chill out." Eventually, while the UPS truck was still going slow, Payne moved into the left lane and sped up to pass it. Ethan assumed Payne was moving to cut off the UPS truck and Payne was still mad. Payne "jerked the wheel hard" to move over in front of the UPS truck and that is when the vehicles collided, and Payne's vehicle hit the pillar. Ethan did not recall the UPS truck changing lanes. He also did not recall the UPS truck swerving into Payne or doing anything that made him feel unsafe. After the crash, Ethan escaped the burning vehicle and yelled at Payne that he had killed Caden.

*Stephan Hall's account of the incident*

Stephan Hall, a FedEx Freight driver, witnessed the events leading to the crash. Hall saw Payne driving in the center lane of three lanes when the UPS semi-truck merged behind Payne and flashed its bright lights. In response, he saw Payne tap his brakes. At that point, the UPS truck moved into the left lane and Payne also moved into the left lane, keeping close in front of the UPS truck. Payne again tapped his brakes in front of the UPS truck. The truck moved back to the center lane and Payne slowed to move beside the truck. Payne eventually sped up and moved into the right lane and onto an exit ramp before he "shot back onto the highway" behind the UPS truck and came around to its driver side. Hall lost sight of Payne's vehicle until he saw a ball of flames from the crash.

3

Hall never saw the UPS truck swerve or move in a way that would have caused Payne to evade. According to Hall, the UPS truck looked like it tried to get away from Payne.

*White's account of the incident*

White, the driver of the UPS semi-truck, described the events leading to the crash. White was driving in the center lane when Payne moved in front of him and started slowing down. He thought Payne may have believed he had his bright lights on, so he flashed his brights momentarily, and Payne came to an almost complete stop in front of him. White had already begun to move into the left lane to avoid Payne when his automatic braking system brought him to a complete stop. White resumed driving and fully merged into the left lane when he noticed Payne holding a cellphone and pointing it at the side of his truck. Payne slowed down, and White, knowing that many states restrict big trucks from using the left lane, merged in front of Payne. Payne moved to the right lane and merged into an exit ramp before moving back around to White's left side in a manner that appeared to White as though Payne would try to cut him off. Payne's vehicle began to move toward White's truck cab, which caused Payne's wheel to rub on White's front bumper. Payne's vehicle then slid in front of White and collided with the bridge pillar. White denied swerving his truck at Payne's vehicle at any time.

*Brian Blandford's account of the incident*

Brian Blandford, another FedEx Freight driver, also witnessed the events leading to the crash. Blandford saw the UPS semi-truck in the middle lane and first noticed "something was going on" when he noticed Payne moving his hands out the window while trying to keep pace with the UPS truck, as though trying to get White's attention. Payne slowed down and got behind the UPS truck "very, very closely" and then moved back into the left lane. At some point, Blandford recalled Payne moving into the exit lane and ramp, and then "immediately getting back off of it." The UPS truck did not react and

continued at a consistent speed as Payne moved to pass him in the left lane. Blandford felt that Payne was becoming more erratic, so he slowed down to create more of a cushion. Blandford did not see the UPS truck make any maneuvers that required Payne to get out of the way. Blandford did not see the collision that caused the crash.

*Payne's statement to the police*

Lieutenant Bradley Todd of the Edwardsville Police Department interviewed Payne at the hospital the day after the crash. The interview was recorded and played to the jury. Payne recounted how he and his sons left a race and drove on Interstate 435 when he came upon a UPS semi-truck driving in the same direction. According to Payne, the semi-truck cut in behind him and nearly hit the tail end of his vehicle. Payne described how the semi-truck followed him closely while flashing its bright lights, so Payne switched lanes to avoid the truck. But as Payne would switch lanes, the truck switched into Payne's lane directly behind him four or five times. Payne pulled into a nearby exit lane and alleged that the truck swerved at him. Payne got back onto the highway and again came up to the truck. When Payne tried to pass on the left, the truck flashed its bright lights again, the two vehicles collided, and Payne's vehicle exploded.

*Proceedings in district court*

On August 25, 2020, the State charged Payne with second-degree murder for the death of Caden and a severity level 4 aggravated battery for the injuries to Ethan. The State's theory throughout the case was that Payne, in a fit of road rage, knowingly and recklessly drove his vehicle in a manner that resulted in the vehicle crash on the highway. Before trial, the State moved for an order determining that Payne's recorded interview was admissible evidence. The district court held a hearing and found that the statement was not a custodial interrogation and that Payne voluntarily gave his statement to Todd.

5

The district court held a four-day jury trial starting on March 28, 2022. Along with the evidence already discussed, there was evidence that White gave a blood sample to investigators, and he was also required by UPS to give a sample the morning after the incident as part of its accident protocol. The test conducted by investigators showed White was positive for marijuana. The UPS sample was negative for marijuana. White denied ingesting marijuana in the 30 days leading up to the accident.

In Ethan's cross-examination, Payne impeached his testimony with a statement he gave to Todd a day after the incident. In his statement, which is not part of the record, Ethan told Todd that the UPS truck cut Payne off and that it also swerved at Payne. Ethan also stated that the UPS truck had its bright lights on and was switching lanes behind Payne. Ethan told Todd that he assumed the UPS truck sped up while Payne was merging to cause the accident. Ethan explained the discrepancies between his testimony and his statement to Todd as him not "want[ing] to believe that my dad did that." But Ethan testified that he was just trying to describe the events as he remembered them.

Todd testified about his interview with Payne. As part of the investigation, Todd searched Payne's cellphone and found a text message sent to the family group chat. The text, which was admitted into evidence, read "Upp234344" and was sent about a minute before the crash occurred. This matched White's assigned unit number on his truck. Todd searched the UPS truck four days after the crash and found no evidence of marijuana.

Patrick Johnson, a police officer who responded to the crash, testified that it did not appear that White was impaired that evening. James Taylor Jr. from the Kansas Highway Patrol Critical Highway Accident Reconstruction Team testified as to how he created a visual reconstruction of the crash. A chart of the reconstruction was admitted into evidence. Taylor opined that the damage to the vehicles was not consistent with White's truck swerving into Payne. But he admitted that the damage could be consistent with Payne's statement that he was blinded by White's bright lights.

6

Payne did not call any witnesses and did not testify, but he introduced into evidence various photographs of the crash site. In closing argument, Payne's counsel described the incident as a "horrific accident" that may have been the result of negligence, but he argued there was no evidence of "knowing" or "reckless" conduct to constitute a crime. He also emphasized how White's driving contributed to the accident.

During the instruction conference, Payne requested an instruction on causation, arguing that the jury should be instructed to consider White's fault and whether that was the primary cause of Caden's death. The district court denied the proposed instruction.

The jury found Payne guilty of the lesser included offense of involuntary manslaughter and a lesser level of aggravated battery. The district court sentenced Payne to a controlling term of 47 months' imprisonment. Payne timely appealed the district court's judgment. Additional facts will be discussed to address the issues.

### DID THE DISTRICT COURT ERR BY NOT PROVIDING A SEPARATE CAUSATION INSTRUCTION FOR THE JURY?

Payne first claims the district court erred by not providing a legally and factually appropriate jury instruction on causation. He also claims the district court failed to give his requested jury instruction on passing in the left lane. He argues that the district court erred by refusing the requested instructions simply because it had denied the State's request for a non-PIK instruction on recklessness. Payne asserts that the State cannot show that the refusal to instruct did not affect the outcome of the trial, so it was reversible error. The State argues that the district court did not err in denying the requested jury instructions and if there was any error, it was harmless.

When analyzing jury instruction issues, appellate courts follow a three-step process: (1) determining whether the appellate court can or should review the issue, in

7

other words, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, in other words, whether the error can be deemed harmless. *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021). Payne requested both jury instructions and the issue is preserved for appeal.

At the second step, appellate courts consider whether the instruction was legally and factually appropriate, using an unlimited standard of review of the entire record. 313 Kan. at 254. In determining whether an instruction was factually appropriate, courts must determine whether there was sufficient evidence, viewed in the light most favorable to the requesting party, that would have supported the instruction. 313 Kan. at 255.

If the challenging party preserved the issue below, an appellate court applies one of two harmless error tests. If the instructional error impacts a constitutional right, an appellate court assesses whether the error was harmless under the federal constitutional harmless error standard, i.e., whether there was no reasonable possibility that the error contributed to the verdict. When no constitutional right is impacted, an appellate court assesses whether there is no reasonable probability the error affected the trial's outcome in light of the entire record. 313 Kan. at 256-57.

Appellate courts consider jury instructions as a whole, without focusing on any single instruction in isolation, to determine whether they properly and fairly state the applicable law or if it is reasonable to conclude that they could have misled the jury. *State v. Buck-Schrag*, 312 Kan. 540, 553, 477 P.3d 1013 (2020). The Kansas Supreme Court "'strongly recommend[s] the use of PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to instructions.'" *State v. Zeiner*, 316 Kan. 346, 353, 515 P.3d 736 (2022). But a district court may modify or add clarifications to PIK instructions if the particular facts in a given case warrant such a change. 316 Kan. at 353.

*The causation instruction*

At trial, Payne requested the following non-PIK instruction on causation:

"The fault or lack of fault of Kelly Dean White is a circumstance to be considered along with all the other evidence to determine whether the defendant's conduct was or was not the direct cause of Taylor Caden Payne's death.

"While contributory negligence is no defense in a prosecution for Murder in the Second Degree, Involuntary Manslaughter or Vehicular Homicide, it is a circumstance to be considered along with all other evidence to determine whether defendant's conduct was or was not the proximate cause of Cayden Payne's death. Kelly Dean White's contributory negligence may have been a substantial factor in his death and a superseding cause thereof; it may have intervened between a defendant's conduct and the fatal result so as to be itself the proximate cause."

In arguing whether the causation instruction was legally and factually appropriate, the parties dispute the applicability of a string of cases decided under similar circumstances. Those cases begin with *State v. Chastain*, 265 Kan. 16, 960 P.2d 756 (1998). The *Chastain* court provided few facts in its opinion. But generally, the case arose after Chastain was in a car accident resulting in the death of another. At trial, Chastain argued that the victim caused his own death by driving through a stop sign and into an intersection. The State claimed Chastain was speeding while under the influence of alcohol. Chastain was charged with involuntary manslaughter but was convicted of the lesser included offense of driving under the influence of alcohol. 265 Kan. at 17-18.

Chastain appealed, but the State reserved a question on whether the district court properly instructed the jury on causation. During deliberations, the jury asked whether it should consider the fault of each driver when interpreting the phrase "'unintentionally killed'" in involuntary manslaughter. 265 Kan. at 23. The district court responded that the victim's "fault . . . was a circumstance to be considered along with all other evidence to

9

determine whether [Chastain's] conduct was or was not the direct cause of [the victim's] death." 265 Kan. at 23. The State argued that the district court's instruction incorrectly told the jury that contributary negligence could be a defense to involuntary manslaughter.

The Kansas Supreme Court disagreed, and in a brief analysis found that even though the relevant statutes once, but no longer, included express language on proximate cause, crimes like involuntary manslaughter and vehicular homicide still required a jury to find the defendant proximately caused the death of the victim. 265 Kan. at 25. But the court added that the causation element "is reflected in the PIK instructions for each offense, both of which inform the jury that the State is required to prove that the defendant unintentionally killed the victim." 265 Kan. at 25. So while the *Chastain* court found no error in the district court's response to the jury question, it also established that the PIK instructions for involuntary manslaughter and vehicular homicide generally tell the jury that the defendant's conduct must be the cause of the victim's death.

This court considered the causation issue more in depth in *State v. Collins*, 36 Kan. App. 2d 367, 138 P.3d 793 (2006). Collins was drinking at a bar in the early morning hours when he left in his truck, following his friend, Winsky, who was driving a motorcycle with a passenger, Curtis. Winsky drove ahead and out of Collins' sight, causing Collins to accelerate to try to catch up. When Collins reached the motorcycle, it was parked in the middle of the road. Winsky had stopped and walked away to urinate while Curtis was still on the bike. Collins hit the parked motorcycle and killed Curtis.

The State charged Collins with involuntary manslaughter while driving under the influence of alcohol. At trial, an accident reconstruction expert testified that Collins' intoxication was irrelevant because even a sober person would have hit the parked motorcycle based on circumstances like the curved road, the time of the accident, standard reaction times, and the stopping distance of Collins' truck. The district court instructed the jury that to establish involuntary manslaughter, the State must prove that

Curtis' death was "'a proximate result of the operation of a vehicle by Brian Collins while under the influence of alcohol.'" 36 Kan. App. 2d at 368. The district court also instructed the jury that proximate cause "'is that cause which in natural continuous sequence, unbroken by an intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence or result of the defendant's act.'" 36 Kan. App. 2d at 368. The jury found Collins guilty of the lesser included offense of driving under the influence of alcohol.

The State appealed and reserved a question on whether the proximate cause instruction given by the district court changed the elements of the crime of involuntary manslaughter. This court's analysis discussed *Chastain* and noted that the statutes on involuntary manslaughter and vehicular homicide "'still require that the conduct of the defendant cause the death of the victim.'" 36 Kan. App. 2d at 371. This court concluded that given the evidence in the case, "the district court did not err in instructing the jury on proximate cause." 36 Kan. App. 2d at 372.

Still, this court found that "the manner in which the court instructed the jury on proximate cause was confusing." 36 Kan. App. 2d at 372. This court suggested the district court should have instructed the jury:  "'The fault or lack of fault of Robyn Curtis is a circumstance to be considered along with all the other evidence to determine whether the defendant's conduct was or was not the direct cause of Robyn Curtis' death.'" 36 Kan. App. 2d at 372. This court found that given the evidence of Curtis' fault and consistent with *Chastain*, "such an instruction would have been warranted in this case." 36 Kan. App. 2d at 372. But in a case without this evidence, the district court should use the standard PIK instruction on involuntary manslaughter. 36 Kan. App. 2d at 372.

This court next decided *State v. Bale*, 39 Kan. App. 2d 655, 182 P.3d 1280 (2008). Bale and her children, including 11-year-old Shawn Casey, were at a campground. Casey suffered from a medical condition that rendered him able to walk only with help from a

11

walker; otherwise he could use a wheelchair or crawl. Casey was playing with his toy cars outside on the ground when Bale put the other children in her car and backed up. While backing up, she ran over Casey, who died as a result. Officers called to the scene noticed a smell of alcohol on Bale, and Bale told them she was intoxicated. The State charged Bale with involuntary manslaughter while driving under the influence of alcohol. At trial, in addition to giving the standard PIK instruction on involuntary manslaughter while driving under the influence of alcohol, the district court instructed the jury:

> "'Contributory negligence of Shawn Casey is no defense. It is a circumstance to be considered along with all other evidence to determine whether [Bale's] conduct was or was not the direct cause of Shawn Casey's death. Shawn Casey's negligence may have been such a substantial factor in his death as to be itself the cause.'" 39 Kan. App. 2d at 659.

The jury found Bale guilty as charged. On appeal, Bale argued that the district court should have instructed the jury to determine "'whether Shawn's death occurred as a proximate result of Ms. Bale's operation of a vehicle while under the influence of alcohol, or whether there was an intervening cause, Shawn's act of crawling behind the car.'" 39 Kan. App. 2d at 659-60. Bale had not objected to the instruction given below, so this court reviewed for clear error. 39 Kan. App. 2d at 659.

In a manner different than in *Chastain* or *Collins*, this court in *Bale* separated causation generally from intervening causation. Starting with causation generally, this court considered the finding in *Chastain* that the requirement to find a defendant "killed" a victim inherently included that the defendant caused the victim's death. 39 Kan. App. 2d at 660. Considering that, and the Black's Law Dictionary definition of "kill," which included "'to cause physical death,'" this court concluded that a separate instruction for general causation is not needed when the PIK instructions required a finding that the defendant killed the victim. 39 Kan. App. 2d at 660.

12

Turning to intervening cause, the *Bale* court then considered whether the district court erred in failing to give Bale's proposed causation instruction. This court applied the rule in *Collins* that an intervening cause instruction is appropriate only if evidence supports a theory that some other person caused the victim's death. But this court found that Bale presented no evidence at trial suggesting that Casey was at fault for being behind the vehicle and causing his own death. 39 Kan. App. 2d at 661. In comparison to the obvious situation in *Collins* where there was evidence that Curtis caused her own death by sitting on a stopped motorcycle in an unavoidable position at night, there was nothing in *Bale* evidencing a cause of death other than Bale's conduct. Thus, consistent with the rule in *Collins*, this court found that the district court did not err in failing to give Bale's proposed instruction. *Bale*, 39 Kan. App. 2d at 661-62.

Finally, the parties argue the applicability of *State v. Kyando*, No. 123,009, 2022 WL 128851 (Kan. App. 2022) (unpublished opinion). While approaching an intersection with what Kyando claimed was a green light, three cars turned left in front of him at a controlled left-turn signal. He collided with the third car, killing its driver and passenger. Kyando was charged with two counts of involuntary manslaughter, and a jury convicted him as charged.

Kyando had requested causation instructions similar to the instructions given in *Collins*, and the district court denied those instructions on the ground that causation was adequately encompassed in the PIK instructions on involuntary manslaughter. The *Kyando* court walked through *Chastain*, *Bale*, and *Collins*. It found first that Kyando's proposed instructions were the same as the instructions in *Collins* that had been affirmed but criticized for being overly confusing. *Kyando*, 2022 WL 128851, at *8-9. This court then considered the holding in *Bale* that causation was inherent in the instructions requiring a jury to find that a defendant "killed" a victim. *Kyando*, 2022 WL 128851, at *9-10. This court observed that Kyando never requested an instruction that the victim failed to yield and did not direct the court to any evidence that the victim entering the

13

intersection violated any law. This court found that Kyando had not presented evidence of another's fault, the factual predicate necessary for an instruction as in *Chastain* and *Collins*. Thus, this court concluded that the district court did not err in failing to give a non-PIK instruction on proximate cause. *Kyando*, 2022 WL 128851, at *12.

Returning to our case, we observe that the first paragraph of Payne's proposed jury instruction on causation adopts language from *Collins*. The second paragraph adopts language from *Chastain*, although nothing in *Chastain* suggests that this language should ever be a jury instruction. To the extent that the proposed instruction told the jury that crimes like involuntary manslaughter and vehicular homicide require a jury to find the defendant proximately caused the victim's death, the language was a correct statement of the law. Thus, Payne's proposed instruction was legally appropriate.

Payne does little to argue how the facts support a causation instruction in accordance with the rules in *Chastain* and *Collins*. He focuses on testimony and evidence that White had a positive blood test for marijuana and that he flashed his bright lights at Payne as evidence that White was the sole cause of the accident. In deciding whether a proposed jury instruction would have been factually appropriate, courts must view the evidence in the light most favorable to the requesting party. *Holley*, 313 Kan. at 255. For the sake of argument, we will assume without deciding that the language in Payne's proposed jury instruction on causation would have been factually appropriate.

But the analysis does not end there. Even if Payne's proposed jury instruction on causation would have been legally and factually appropriate, that does not mean that the district court erred by giving the standard PIK instructions on the elements of the crimes Payne was charged with committing and not the separate instruction Payne requested. The courts in *Chastain* and *Collins* both emphasize that the causation element for involuntary manslaughter is reflected in the PIK instruction for that offense. *Chastain*, 265 Kan. at 25; *Collins*, 36 Kan. App. 2d at 372. There is no reported Kansas case that

14

has found that a district court was *required* to give a separate non-PIK instruction on proximate cause in cases like Payne's. The closest any court has come is *Collins* where this court found a separate instruction on proximate cause "would have been warranted" under the facts. 36 Kan. App. 2d at 372. There, an accident reconstruction expert testified that Collins' intoxication was irrelevant because even a sober person would have hit the parked motorcycle based on the evidence presented to the jury.

Here, the district court instructed the jury that to find Payne guilty of involuntary manslaughter, the State must prove that "[t]he defendant killed Caden Payne." See PIK Crim. 4th 54.180 (2019 Supp.). The district court also instructed the jury: "The State must prove that the defendant committed the crime of Involuntary Manslaughter recklessly. A defendant acts recklessly when the defendant consciously disregards a substantial and unjustifiable risk that a result of the defendant's actions will follow." See PIK Crim. 4th 52.010 (2021 Supp.). As the court stated in *Chastain*, this language is generally sufficient to reflect the causation element of the crime of involuntary manslaughter. 265 Kan. at 25. The language in the aggravated battery instruction was even clearer. The district court instructed the jury that to find Payne guilty of aggravated battery, the State must prove that Payne "knowingly *caused* bodily harm to Ethan Payne in any manner whereby great bodily harm, disfigurement or death can be inflicted." (Emphasis added.) See PIK Crim. 4th 54.310 (2020 Supp.).

Appellate courts consider jury instructions as a whole to determine whether they properly and fairly state the applicable law. *Buck-Schrag*, 312 Kan. at 553. Even though the district court could have given a separate non-PIK jury instruction on causation, this does not mean the court erred by not giving the proposed instruction. The district court's jury instructions accurately covered the elements of each charged offense including the required causation and allowed Payne to present his defense to the charges. There was some evidence presented at Payne's trial that White's erratic driving may have contributed to the crash that resulted in the death and injuries to Caden and Ethan—mainly through

15

Payne's recorded statement to Todd on the day after the incident. The jury was allowed to consider this evidence and Payne was allowed to argue how White's driving contributed to the accident. Based on the record presented, we conclude the district court did not err by not giving the separate proposed instruction on causation. Because we find no error, we need not address the State's argument that any error was harmless.

*The passing on the left instruction*

Payne also claims the district court failed to give his requested jury instruction on passing in the left lane. At trial, Payne proposed the following jury instruction:

> "The driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left thereof at a safe distance and shall not again drive to the right side of the roadway until safely clear of the overtaken vehicle. The driver of an overtaken vehicle except when overtaking and passing on the right is permitted shall give way to the right in favor of the overtaking vehicle on audible signal and shall not increase the speed of his vehicle until completely passed by the overtaking vehicle."

The instruction is modeled after K.S.A. 8-1516(a) and (b), although Payne did not cite this statute as authority in his proposed jury instructions. The instruction is common in civil trials and car accident cases. See PIK Civ. 4th 121.19(A). The district court denied the instruction but gave no reason for doing so.

The State argues this jury instruction is inapplicable to a three-lane highway, citing K.S.A. 8-1514(a)(3). But this statute addresses when driving on the right side of a roadway is required. There is no language in K.S.A. 8-1516, which addresses passing a vehicle on the left, indicating that the provisions of that statute do not apply to three-lane highways. Thus, the proposed instruction is an accurate statement of the law and there was testimony that Payne and White were passing each other leading up to the crash.

16

Even if we find the proposed instruction would have been legally and factually appropriate, we are confident there is no reasonable probability that failing to give the instruction affected the trial's outcome in light of the entire record. See *Holley*, 313 Kan. at 256-57. If the jury believed the bulk of the State's evidence, as it apparently did, Payne obviously failed to properly pass White's semi-truck on the left and safely merge to the center lane. Had the jury believed Payne's account of the incident provided in his recorded statement to Todd, they would have found Payne not guilty of the charges. But the jury did not need to be instructed on the basic and well-known rules of the road to decide the case. We find that any error in failing to give this instruction was harmless.

## DID THE DISTRICT COURT ERR IN FINDING PAYNE GAVE A VOLUNTARY STATEMENT TO THE POLICE AND ADMITTING THE STATEMENT INTO EVIDENCE?

Next, Payne claims the district court erred in finding that Payne gave a voluntary statement to Todd and admitting the recorded statement into evidence. As a threshold issue, we must address whether the issue is preserved for appeal. "Generally, a party may not present an issue on appeal 'where no contemporaneous objection was made and where the trial court did not have an opportunity to rule.'" *State v. Dukes*, 290 Kan. 485, 487, 231 P.3d 558 (2010) (quoting *State v. Kirtdoll*, 281 Kan. 1138, 1148, 136 P.3d 417 [2006]). This rule prevents appellate review of evidentiary issues unless there was a timely and specific objection at trial. *Dukes*, 290 Kan. at 487-88.

K.S.A. 60-404 states that a verdict shall not be set aside, nor shall a judgment be reversed, because of the erroneous admission of evidence "unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." The Kansas Supreme Court has made clear that appellate courts must strictly enforce the contemporaneous objection rule. See *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009).

17

Payne argues the issue was preserved below because he raised the issue before trial and the district court heard argument and fully adjudicated the issue. The State counters that Payne failed to object at trial and thus did not contemporaneously object at the time the statement was admitted into evidence. The State is correct. When it moved to admit the recorded statement into evidence, Payne's counsel responded, "No objection, Judge." Payne does not attempt to address the failure to contemporaneously object at trial nor does he allege to have lodged a standing objection, and a review of the record does not show a standing objection was made. Thus, we decline to address Payne's claim about the admission of his recorded statement because the issue is not preserved for appeal.

DID THE STATE COMMIT PROSECUTORIAL ERROR IN ITS CLOSING ARGUMENT?

Next, Payne claims the prosecutor committed reversible error in closing argument and denied him a fair trial by defining the terms "accident" and "road rage." The State contends the prosecutor did not commit error in closing argument, but if there was error, it was harmless.

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

18

The State began its closing argument as follows:

> "Road rage. If you look it up in the dictionary, it says aggressive behavior caused by a stressful or frustrating situation. If you look up accident—that word has been used a lot—an event that begins by chance.
> "Ladies and gentlemen, this crash did not happen by chance. The defendant's actions caused this crash."

Payne claims the prosecutor erred by defining the terms "accident" and "road rage" during closing argument. He argues the prosecutor confused the jury by replacing elements of the crimes charged with those definitions. But the record does not support Payne's claim. The prosecutor, in two sentences, gave brief definitions for road rage and accident before immediately pivoting to the evidence to argue that Payne acted recklessly with conscious disregard or indifference to human life. Payne concedes this in his brief.

Payne cites later in the closing argument where the prosecutor said Payne "had road rage that night, had no regard for anybody at all and killed his own son and burned up his other one." But the mere reference to road rage is unsurprising where the entire case centered on whether Payne or White drove aggressively and caused the crash. And nowhere in the State's closing argument did the prosecutor substitute or interchange elements of the crimes, nor did the prosecutor suggest that a road rage finding equated to a guilty finding. Instead, the prosecutor focused on the evidence and whether it showed Payne acted recklessly, which Payne concedes was an element to the crimes charged. Although the better practice would be to avoid adding definitions in a closing argument, the prosecutor did so here briefly and passingly before shifting to the evidence and elements of the crimes charged. We find no prosecutorial error.

19

DID CUMULATIVE ERROR DENY PAYNE A FAIR TRIAL?

Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. In assessing the cumulative effect of errors during the trial, appellate courts examine the errors in context and consider how the trial judge dealt with the errors as they arose; the nature and number of errors and whether they are interrelated; and the overall strength of the evidence. If any of the errors being aggregated are constitutional in nature, the cumulative effect must be harmless beyond a reasonable doubt. *State v. Guebara*, 318 Kan. 458, 483, 544 P.3d 794 (2024). The cumulative error rule does not apply if there are no errors or only a single error. *State v. Lowry*, 317 Kan. 89, 100, 524 P.3d 416 (2023). At best, we have found only one harmless error committed in Payne's trial based on the arguments presented in the briefs—the failure to instruct the jury on passing on the left. As a result, Payne's claim of cumulative error fails.

Affirmed.